## MORRIS, WARDEN v. SLAPPY

No. 81–1095.   Argued December 1, 1982—Decided April 20, 1983

2

Burger, C. J., delivered the opinion of the Court, in which White, Powell, Rehnquist, and O'Connor, JJ., joined. Brennan, J., filed an opinion concurring in the result, in which Marshall, J., joined, *post*, p. 15. Blackmun, J., filed an opinion concurring in the judgment, in which Stevens, J., joined, *post*, p. 29.

*Dane R. Gillette*, Deputy Attorney General of California, argued the cause for petitioner. With him on the briefs were *George Deukmejian*, Attorney General, *Robert H. Phili-*

*bosian*, Chief Assistant Attorney General, *William D. Stein*, Assistant Attorney General, and *W. Eric Collins* and *Herbert F. Wilkinson*, Deputy Attorneys General.

*Michael B. Bassi*, by appointment of the Court, 456 U. S. 942, argued the cause and filed a brief for respondent.*

CHIEF JUSTICE BURGER delivered the opinion of the Court.

The question presented is whether it was error for the Court of Appeals to hold that the state trial court violated respondent's Sixth Amendment right to counsel by denying respondent's motion for a continuance until the Deputy Public Defender initially assigned to defend him was available. We granted certiorari, 456 U. S. 904 (1982), and we reverse.

The issues raised arise out of two trials in the state court, the second trial having been held on two counts on which the first jury could not agree. Respondent was convicted of robbery, burglary, and false imprisonment in the first trial; he was convicted of rape and forcible oral copulation in the second. On review of all five counts, the California Court of Appeal, First Appellate District, affirmed the convictions, and the California Supreme Court denied review. Thereafter the United States District Court denied respondent's petition for a writ of habeas corpus. This denial was reversed by the United States Court of Appeals, which held that the Sixth Amendment guarantees a right to counsel with whom the accused has a "meaningful attorney-client relation-

---

*Briefs of *amici curiae* urging reversal were filed by *Solicitor General Lee, Assistant Attorney General Jensen, Deputy Solicitor General Frey*, and *Edwin S. Kneedler* for the United States; and by *Richard J. Wilson* and *Howard B. Eisenberg* for the National Legal Aid and Defender Association.

*Dennis A. Fischer, Jeff Brown, Ephraim Margolin, Robert Altman, John J. Cleary, James R. Dunn*, and *Terence F. MacCarthy* filed a brief for the National Association of Criminal Defense Lawyers et al. as *amici curiae* urging affirmance.

ship," and that the trial judge abused his discretion and violated this right by denying a motion for a continuance based on the substitution of appointed counsel six days before trial. 649 F. 2d 718 (CA9 1981).

I

Respondent's *pro se* petition for a writ of habeas corpus in the United States District Court set forth two grounds for relief: (a) that the state "[t]rial court abused its discretion by failing to order a substitution of counsel after [respondent and counsel became] embroiled in irreconcilable conflict," Record 3; and (b) that the trial court had not permitted him to testify in his own behalf in the second trial. *Ibid.* The facts shown by the record conclusively rebut both these claims and are alone dispositive, independent of the correctness of the novel Sixth Amendment guarantee announced by the Court of Appeals.

A

After midnight on July 7, 1976, the victim, a young woman, left her apartment to shop at a nearby grocery store in San Francisco. There she was accosted by respondent and when she complained to the store manager, he ordered respondent to leave. Respondent waited for the victim outside; when the victim left the store, respondent threw a beer bottle at her. She asked the store manager to call the police, but he told her just to walk away. She then walked home taking the long way around the block, but when she entered her apartment house, respondent was waiting for her in the lobby. From this fact, the jury could have inferred that respondent had been stalking the victim from the time she first left her apartment. Respondent forced the victim into the basement, where, she testified, he raped and sodomized her and then robbed her.

The victim managed to escape from respondent and fled from the building into a nearby all-night diner, where she was sheltered until the police came. She gave the police a

description of her assailant; he was apprehended two blocks away.   He was wearing the green fatigue jacket with fur-trimmed hood and the "Afro" style wig that the victim had described to the police.   On his person the police found jewelry taken from the victim.   The respondent told the booking officer that he had been given the jewelry by a woman whose last name he did not recall and whose address he did not know.   Police found the victim's clothing scattered on the floor of the basement of her apartment building and a button from respondent's jacket on the basement steps.

Respondent was charged in San Francisco Superior Court with five felonies.[1]   The court appointed the San Francisco Public Defender's Office to represent respondent and Deputy Public Defender Harvey Goldfine was assigned to defend the accused.   Goldfine represented respondent at the preliminary hearing and supervised an extensive investigation. The trial was scheduled for Thursday, September 23, 1976. Shortly prior to trial, however, Goldfine was hospitalized for emergency surgery.   On Friday, September 17, six days before the scheduled trial date, the Public Defender assigned Bruce Hotchkiss, a senior trial attorney in the Public Defender's Office, to represent respondent.

On the day he was assigned the case, Hotchkiss interviewed respondent in jail and advised him of the substitution. Between that date and the following Tuesday, September 21, Hotchkiss reviewed the files and investigation prepared by his colleague.   On Tuesday, he conferred with respondent for three hours; on the following day he again met with respondent in the morning and afternoon.

---

[1] Respondent was charged with rape, Cal. Penal Code Ann. § 261, subd. 3 (West 1970); forcible oral copulation, Cal. Penal Code Ann. § 288a (West 1970); second-degree burglary, Cal. Penal Code Ann. § 459 (West 1970); second-degree robbery, Cal. Penal Code Ann. § 211a (West 1970); and false imprisonment, Cal. Penal Code Ann. § 236 (West 1970).

6

(a) *First Day of First Trial*

The first trial began as scheduled on Thursday, September 23. At the opening of trial, respondent told the court: "I only have this P. D. [Public Defender] for a day and a half, we have not had time to prepare this case. He came in Tuesday night, last Tuesday night was the first time I saw him. . . . We have not had enough time to prepare this case." App. 7.

Construing respondent's remarks as a motion for a continuance, the court denied the motion, noting that the case had been assigned to Hotchkiss the previous Friday, six days before the trial date, and that Hotchkiss stated he had "investigated the case, [and] studied it." *Id.*, at 8. In reply, respondent repeated his claim that Hotchkiss had only been on the case for a day and a half.

Respondent then stated:

> "[T]his past Tuesday was the first time [Hotchkiss interviewed me.] He said he was busy and he couldn't make it up there. He only *[sic]* been on this case one day and a half your Honor, he can't possibly have had enough time to investigate all these things in this case. Some of the major issues have not been investigated. It's impossible for him to have time enough to take care of this case to represent this case properly, the way it should be represented." *Ibid.*

Hotchkiss explained Goldfine's absence and stated that he was prepared to try the case on the basis of his study of the investigation made by Goldfine and his conferences with respondent. "I feel that I am prepared. My own feeling is that a further continuance would not benefit me in presenting the case." *Id.*, at 11. Respondent replied that he was "*satisfied with the Public Defender*, but it's just no way, no possible way, that he has had enough time to prepare this case." *Id.*, at 12 (emphasis added).

The trial judge repeated that he was confident that the Public Defender's Office was representing respondent ade-

quately and that Hotchkiss was an experienced counsel; the court again denied a continuance. *Id.*, at 9.

(b) *Second Day of First Trial*

At the start of the second day of trial, on Friday, September 24, 1976, respondent again complained that Hotchkiss was not prepared. When the court expressed its confidence in Hotchkiss, respondent said:

> "I don't mean he's not a good P. D., *I don't have anything against him.* It's just that he didn't have time to prepare the case, one day and a half." *Id.*, at 18 (emphasis added).

The trial judge again stated that he was satisfied that the case had been "well prepared" by Goldfine, and that Hotchkiss had been assigned to the case the previous week, had read the transcript of the preliminary hearing, and had "prepared the case, reviewed all the matters, obtained the pictures, and other items that he intends to produce into evidence." *Ibid.* In conclusion, the trial judge stated: "I am satisfied . . . that Mr. Hotchkiss is doing a more than adequate job, a very fine job." *Id.*, at 18–19.

When respondent continued to complain that Hotchkiss had not adequately investigated the case, Hotchkiss told the court:

> "My feeling is that all investigation that needed to be done and that should be done and quite possibly that could have been done has been done." *Id.*, at 21–22.

Finally, Hotchkiss pointed out that he would have the weekend between the close of the prosecution's case and the beginning of the defense's case for further conferences with respondent. *Id.*, at 22–23.

At this time—on the second day of the first trial—respondent first mentioned Goldfine's name. After complaining again about Hotchkiss' alleged lack of time for preparation, respondent said: "Mr. Harvey Goldfine was my attorney, he was my attorney, and he still is. I haven't seen him in five

weeks because he's in the hospital." *Id.*, at 24. Respondent then claimed that not even Goldfine had had enough time to prepare the case: "Mr. Harvey Goldfine didn't even have enough time to go over my case with me, he didn't even have time." *Ibid.* Respondent concluded these remarks with additional complaints about Hotchkiss' preparation.

### (c) *Third Day of First Trial*

Trial resumed four days later, on Tuesday, September 28, 1976. Out of the presence of the jury, respondent presented the court with a *pro se* petition for a writ of habeas corpus, claiming that he was unrepresented by counsel. In support of his petition, respondent claimed that Goldfine, not Hotchkiss, was his attorney. Specifically, he said that the writ should be granted on

> "the grounds that my attorney's in the hospital, and I don't legally have no attorney, and this P. D. here told me, this P. D., Mr. Hotchkiss, Bruce Hotchkiss, *told me I didn't have no defense to my charges.*" *Id.*, at 29 (emphasis added).

Hotchkiss disputed this charge. The trial court treated the petition as a renewal of respondent's motion for a continuance, and denied it.

Following the court's ruling, respondent announced that he would not cooperate at all in the trial and asked to be returned to his cell. The court urged respondent to cooperate but respondent refused, claiming that Hotchkiss did not represent him: "I don't have any Counsel, I just got through telling you, I don't have no Counsel." *Id.*, at 32. However, respondent remained in the courtroom and the trial proceeded.

Later, respondent renewed his attack:

> "What do I have to say to get through to you, your Honor, what do I have to say to make you understand. I have told you two or three times, and then you keep telling me about talking to my Counsel. I don't have

no attorney, I told you I don't have no attorney.   My attorney's name is Mr. P. D. Goldfine, Harvey Goldfine, that's my attorney, he's in the hospital." *Id.*, at 37–38.

Ultimately, respondent refused to take the stand, ignoring Hotchkiss' advice that he testify.   The jury returned a verdict of guilty on the robbery, burglary, and false imprisonment counts, but failed to reach a verdict on the rape and oral copulation counts.

(d) *Second Trial*

A week later, a second trial was held on the charges left unresolved as a result of the mistrial and Hotchkiss again appeared for respondent.   Once more, respondent ignored Hotchkiss' advice and refused to take the stand.[2]   Indeed, respondent refused to cooperate with or even speak to Hotchkiss.   The second jury returned a guilty verdict on the sexual assault counts.   The California Court of Appeal affirmed respondent's convictions on all five counts; the California Supreme Court denied review.

## B

The United States District Court for the Northern District of California (Peckham, J.) construed the *pro se* petition for a writ of habeas corpus liberally as including a claim that the trial court abused its discretion both in denying a continuance to allow Hotchkiss additional time to prepare and in denying a continuance to permit Goldfine to defend respondent.   In denying the writ, the District Court stated:

"The record supports the trial judge's conclusion that Hotchkiss had adequate time to prepare for the trials

---

[2] After the jury had been charged, but before it had retired to begin deliberations, respondent asked the judge in open court to permit him to take the stand and testify.   A chambers conference was then held, at which the judge denied respondent's motion to testify, concluding it had been made in bad faith: "I am denying it because I am not convinced.   All you're trying to do is make a record for appeal . . . ."   App. 52.

and that he presented an able defense despite [respondent's] lack of cooperation with him." App. to Pet. for Cert. D3–D4.

The District Court also rejected respondent's claim that the trial court should have granted the continuance to permit Goldfine to represent respondent, stating that

"it was not unreasonable to conclude that the efficient administration of justice required that petitioner be represented by Hotchkiss rather than Goldfine after the latter had fully recovered from surgery." *Id.*, at D4–D5.

The District Court thus rejected any claim that the state trial judge had abused his discretion in denying a continuance.[3]

In reversing the District Court's denial of the writ, the Court of Appeals acknowledged that "an indigent defendant does not have an unqualified right to the appointment of counsel of his own choosing," but argued that respondent was not seeking appointment of counsel of his own choosing; rather, he "was merely seeking a continuance of the trial date so that his attorney [Goldfine] would be able to represent him at trial." 649 F. 2d, at 720.

The Court of Appeals went on to announce a new component of the Sixth Amendment right to counsel. The Sixth Amendment right, it held, would

"be without substance *if it did not include the right to a meaningful attorney-client relationship.*" *Ibid.* (emphasis added).

The court seems to have determined, solely on the basis of respondent's confusing and contradictory remarks on the subject, that respondent had developed such a "meaningful attorney-client relationship" with Goldfine but not with Hotchkiss.

_____

[3] The District Court also rejected the claim that the trial judge had abused his discretion in denying respondent the opportunity to testify after the jury had already been charged in the second trial.

The Court of Appeals next stated that the trial court, having failed to inquire about the probable length of Goldfine's absence, could not have weighed respondent's interest in continued representation by Goldfine against the State's interest in proceeding with the scheduled trial. The Court of Appeals concluded that the trial court's failure to conduct this balancing test ignored respondent's Sixth Amendment right to a "meaningful attorney-client relationship" and hence violated respondent's right to counsel;[4] this violation was held to require reversal without any need to show prejudice. The Court of Appeals directed that the writ issue unless respondent received a new trial on all five counts.

## II

Not every restriction on counsel's time or opportunity to investigate or to consult with his client or otherwise to prepare for trial violates a defendant's Sixth Amendment right to counsel. See *Chambers* v. *Maroney*, 399 U. S. 42, 53–54 (1970). Trial judges necessarily require a great deal of latitude in scheduling trials. Not the least of their problems is that of assembling the witnesses, lawyers, and jurors at the same place at the same time, and this burden counsels against continuances except for compelling reasons. Consequently, broad discretion must be granted trial courts on matters of continuances; only an unreasoning and arbitrary "insistence upon expeditiousness in the face of a justifiable

---

[4] The Court of Appeals undertook to confine its holding to cases where the defendant requests a continuance in good faith. Here, the court asserted: "The record clearly demonstrates the sincerity of Slappy's desire to be represented by Goldfine, and the state has not contended that Slappy was acting in bad faith. . . . [T]here is nothing in the record from which it can be inferred that Slappy's request for a continuance was motivated by a desire to delay his trial for an improper purpose." 649 F. 2d, at 722. Nothing in the record affords any support for these "findings" of the Court of Appeals. By contrast, the State asserts that it has "always contended that Slappy was acting in bad faith when he demanded that Goldfine rather than Hotchkiss represent him." Brief for Petitioner 38, n. 23.

request for delay" violates the right to the assistance of counsel. *Ungar* v. *Sarafite*, 376 U. S. 575, 589 (1964).

We have set out at greater length than usual the record facts showing Hotchkiss' prompt action in taking Goldfine's place, his prompt study of the investigation, his careful review of the materials prepared by Goldfine for trial, his conferences with respondent, and his representation to the court that "a further continuance would not benefit me in presenting the case," App. 11. In the face of the unequivocal and uncontradicted statement by a responsible officer of the court that he was fully prepared and "ready" for trial, it was far from an abuse of discretion to deny a continuance. On this record, it would have been remarkable had the trial court not accepted counsel's assurances.

Nor is there any merit to the claim that the denial of a continuance prevented Hotchkiss from being fully prepared for trial. Despite respondent's adamant—even contumacious—refusal to cooperate with Hotchkiss or to take the stand as Hotchkiss advised, in spite of respondent's numerous outbursts and disruptions, and in the face of overwhelming evidence of guilt, Hotchkiss succeeded in getting a "hung jury" on the two most serious charges at the first trial. Given the undisputed and overwhelming evidence of guilt, the jury's failure at the first trial to convict the defendant on the more serious charges cannot reflect other than favorably on Hotchkiss' readiness for trial.

### III

In holding that the trial judge violated respondent's right to the assistance of counsel by arbitrarily refusing a continuance that would have permitted Goldfine to try the case, the Court of Appeals misread the record and the controlling law and announced a new constitutional standard which is unsupported by any authority.

### A

The Court of Appeals' first error was in reading the record as indicating that respondent timely and in good faith moved

for a delay to permit Goldfine to continue to represent him. The transcript clearly shows that respondent did not specifically assert a concern for continued representation by Goldfine until the third day of trial, 11 days after Hotchkiss had been substituted for Goldfine. Until then, all that respondent sought was a delay to give Hotchkiss additional time that respondent, but not Hotchkiss, thought necessary to prepare for trial. Moreover, respondent specifically disavowed any dissatisfaction with counsel; he informed the court on the first day of trial that he was "satisfied" with Hotchkiss. *Id.*, at 12. On this record, we cannot fathom how the Court of Appeals could have construed these complaints about Hotchkiss' alleged lack of time in which to prepare as indicating an unspoken preference for Goldfine.

On the contrary, the trial court was abundantly justified in denying respondent's midtrial motion for a continuance so as to have Goldfine represent him. On this record, it could reasonably have concluded that respondent's belated requests to be represented by Goldfine were not made in good faith but were a transparent ploy for delay. In our view, the record shows that the trial judge exhibited sensitive concern for the rights of the accused and extraordinary patience with a contumacious litigant.[5]

### B

The Court of Appeals' conclusion that the Sixth Amendment right to counsel "would be without substance if it did not include the right to a *meaningful attorney-client relationship*," 649 F. 2d, at 720 (emphasis added), is without basis in the law. No authority was cited for this novel ingredient of the Sixth Amendment guarantee of counsel, and of course none could be. No court could possibly guarantee that a defendant will develop the kind of rapport with his attorney—privately retained or provided by the public—that

---

[5] Nor did the trial court abuse its discretion in denying respondent's motion to testify in the second trial after closing argument had been made and after the jury had been instructed.

the Court of Appeals thought part of the Sixth Amendment guarantee of counsel. Accordingly, we reject the claim that the Sixth Amendment guarantees a "meaningful relationship" between an accused and his counsel.[6]

## IV

We have gone to unusual length in discussing the facts and relevant authorities in order to evaluate the claim of abuse of discretion by the trial judge and to deal with the novel idea that the Sixth Amendment guarantees an accused a "meaningful attorney-client relationship." Had the Court of Appeals examined the record more carefully, it would have had no occasion to consider, let alone announce, a new constitutional rule under the Sixth Amendment.

In its haste to create a novel Sixth Amendment right, the court wholly failed to take into account the interest of the victim of these crimes in not undergoing the ordeal of yet a third trial in this case. Of course, inconvenience and embarrassment to witnesses cannot justify failing to enforce constitutional rights of an accused: when prejudicial error is made that clearly impairs a defendant's constitutional rights, the burden of a new trial must be borne by the prosecution, the courts, and the witnesses; the Constitution permits nothing less. But in the administration of criminal justice, courts may not ignore the concerns of victims. Apart from all other factors, such a course would hardly encourage victims to report violations to the proper authorities; this is especially so when the crime is one calling for public testimony about a humiliating and degrading experience such as was involved here. Precisely what weight should be given to the ordeal of reliving such an experience for the third time need not be de-

---

[6] The Court of Appeals seems to have believed that an appointed counsel with whom the accused did not have a "meaningful relationship" was the equivalent of no counsel; as a consequence, it held that no prejudice need be shown for violations of the right to a "meaningful" attorney-client relationship. Our holding that there is no Sixth Amendment right to a "meaningful attorney-client relationship" disposes of that argument.

cided now; but that factor is not to be ignored by the courts. The spectacle of repeated trials to establish the truth about a single criminal episode inevitably places burdens on the system in terms of witnesses, records, and fading memories, to say nothing of misusing judicial resources.

Over 75 years ago, Roscoe Pound condemned American courts for ignoring "substantive law and justice," and treating trials as sporting contests in which the "inquiry is, Have the rules of the game been carried out strictly?" Pound, The Causes of Popular Dissatisfaction With the Administration of Justice, 29 ABA Ann. Rep. 395, 406 (1906). A criminal trial is not a "game," and nothing in the record of respondent's two trials gives any support for the conclusion that he was constitutionally entitled to a new trial. The state courts provided respondent a fair trial, and the United States District Judge properly denied relief.

The judgment of the Court of Appeals is reversed, and the case is remanded with directions to reinstate the judgment of the District Court.

*It is so ordered.*

JUSTICE BRENNAN, with whom JUSTICE MARSHALL joins, concurring in the result.

The Court states that "[i]n its haste to create a novel Sixth Amendment right, the [Court of Appeals] wholly failed to take into account the interest of the victim of these crimes in not undergoing the ordeal of yet a third trial in this case." *Ante*, at 14. Unfortunately, it could just as easily be said of the Court that in its haste to "deal with the novel idea that the Sixth Amendment guarantees an accused a 'meaningful attorney-client relationship,'" *ibid.*, the Court reaches issues unnecessary to its judgment, mischaracterizes the Court of Appeals' opinion, and disregards the crucial role of a defendant's right to counsel in our system of criminal justice. For the reasons described below, I concur only in the Court's reversal of the Court of Appeals' judgment.

## I

After reviewing the record of the proceedings in the state trial court, the Court of Appeals concluded that respondent moved for a continuance based on the unavailability of Harvey Goldfine, the Deputy Public Defender originally appointed to represent him. 649 F. 2d 718, 719–720 (CA9 1981). The court, therefore, proceeded to consider whether the trial court had denied respondent's Sixth Amendment right to counsel by refusing to grant his motion for a continuance until Goldfine was well enough to represent him at trial. *Id.*, at 720. In considering this question, the Court of Appeals acknowledged that "an indigent defendant does not have an unqualified right to the appointment of counsel of his own choosing." *Ibid.* The court stated, however, that after a particular attorney is appointed to represent a defendant, the defendant and his attorney develop a relationship that is encompassed by the Sixth Amendment right to counsel. *Ibid.* In the court's view, the attorney-client relationship is important to a defendant's Sixth Amendment right to counsel because it affects the quality of representation and the defendant's ability to present an effective defense. *Id.*, at 720–721. In this regard, the court noted that unreasonable denials of continuances when a defendant has retained counsel can amount to a denial of the right to counsel or to a violation of due process. *Id.*, at 721. The court saw no reason "to distinguish between appointed and retained counsel in the context of preserving an attorney-client relationship." *Ibid.*

In light of "the importance of the attorney-client relationship to the substance of the defendant's sixth amendment right to counsel," the court held that "the sixth amendment (as incorporated by the fourteenth amendment) encompasses the right to have the trial judge accord weight to that relationship in determining whether to grant a continuance founded on the temporary unavailability of a defendant's particular attorney." *Ibid.* The court stated that in consider-

ing motions for continuances based on the temporary unavailability of counsel, "the trial court must balance the defendant's constitutional right to counsel against the societal interest in the 'prompt and efficient administration of justice.'" *Ibid.* (citation omitted). In this case, the trial judge failed to inquire into the expected length of Goldfine's unavailability and, therefore, could not "engage in the balancing required to protect [respondent's] rights." *Id.*, at 722. As a result, respondent had been denied his right to counsel as that right was construed by the Court of Appeals. *Ibid.*[1]

The Court of Appeals next concluded that no showing of prejudice was required for reversal of the conviction. *Ibid.* In reaching this conclusion, the court stated that this case did not involve a claim of ineffective assistance of counsel, which it previously had held to require a showing of prejudice to justify reversal. *Id.*, at 722, and n. 4. Instead, the court analogized this case to cases in which counsel is either not provided or in which counsel is prevented from fulfilling normal functions. *Id.*, at 723. In such cases a defendant is not required to demonstrate prejudice. *Ibid.*[2]

## II

I agree with the Court that the Court of Appeals misread the record in concluding, at least implicitly, that respondent made a timely motion for a continuance based on Goldfine's

---

[1] The Court of Appeals stated that there was "nothing in the record from which it [could] be inferred that [respondent's] request for a continuance was motivated by a desire to delay his trial for an improper purpose." 649 F. 2d, at 722. The court, therefore, found it unnecessary to reach the question of whether the "same result would obtain if it were shown that the defendant's request for a continuance was made in bad faith." *Ibid.*

[2] The court limited its holding to cases in which "a trial court does not attempt to ascertain the length of continuance necessary to insure counsel's presence at trial, and the attorney with whom the defendant has an attorney-client relationship does not appear at trial . . . ." *Id.*, at 723.

unavailability and on his desire to have Goldfine represent him at trial. *Ante*, at 12–13.[3]

Respondent based his initial motion for a continuance on the ground that Hotchkiss had not had enough time to prepare the case. App. 7–13. On the second day of trial, respondent again complained that Hotchkiss had not had enough time to prepare. *Id.*, at 17. For the first time respondent also mentioned Goldfine and stated that Goldfine "was [his] attorney." *Id.*, at 24. Respondent went on to state that he had not seen Goldfine in five weeks because Goldfine was in the hospital. *Ibid.* Respondent suggested, however, that Goldfine "didn't even have time enough to go over my case with me, he didn't even have time." *Ibid.* It is clear, therefore, that respondent was basing his inartful motions for a continuance on the inadequate preparation of his appointed counsel. Even construing respondent's statements liberally, as a court should, there is no way the trial judge reasonably could have understood that respondent's motions for a continuance were based on Goldfine's unavailability and on respondent's desire to be represented by him. Based on Hotchkiss' assurances that he was prepared, *id.*, at 10–11; see *id.*, at 21–23, the trial judge clearly did not abuse his discretion in denying a continuance.

On the third day of trial, following an intervening weekend, respondent filed a "Writ of Habeas Corpus" with the trial court. *Id.*, at 28. He stated that the writ was based, in part, on the ground that his attorney was in the hospital and that he did not "legally have [an] attorney." *Id.*, at 29. During his discussion with the trial judge, respondent repeatedly stated that he did not have an attorney and that his at-

---

[3] Unlike the Court, *ante*, at 13, I find no need to reach the issue of respondent's good faith in moving for a continuance. I also do not endorse the Court's gratuitous disagreement, *ante*, at 11, n. 4, with the Court of Appeals' statement that there was "nothing in the record from which it [could] be inferred that [respondent's] request for a continuance was motivated by a desire to delay his trial for an improper purpose." 649 F. 2d, at 722.

torney was in the hospital. See *id.*, at 32, 38, 41. At this point, the trial judge reasonably could be expected to have understood that respondent was moving for a continuance based on Goldfine's unavailability and on his desire to be represented by Goldfine. As the Court points out, however, respondent finally made clear the grounds for his motions 11 days after Hotchkiss had been substituted for Goldfine, *ante*, at 13, and 5 days after the trial had begun. I agree with the Court that the trial judge was justified "in denying respondent's midtrial motion for a continuance. . . ." *Ibid.* See *Ungar* v. *Sarafite*, 376 U. S. 575, 588–591 (1964).

Because respondent did not make a timely motion for a continuance based on Goldfine's unavailability, I concur in the Court's reversal of the Court of Appeals' judgment. We need go no further to support a reversal. The Court recognizes as much when it states that "[t]he facts shown by the record conclusively rebut [respondent's] claims and are alone dispositive, independent of the correctness of the novel Sixth Amendment guarantee announced by the Court of Appeals." *Ante*, at 4. See also *ante*, at 14.

### III

Despite the Court's recognition that it is unnecessary to its decision, the Court rejects summarily "the claim that the Sixth Amendment guarantees a 'meaningful relationship' between an accused and his counsel." *Ibid.* (footnote omitted). The Court states simply that the Court of Appeals cited no authority "for this novel ingredient of the Sixth Amendment guarantee of counsel, and of course none could be." *Ante*, at 13. In the Court's view, "[n]o court could possibly guarantee that a defendant will develop the kind of rapport with his attorney—privately retained or provided by the public—that the Court of Appeals thought part of the Sixth Amendment guarantee of counsel." *Ante*, at 13–14. This is the extent of the Court's analysis. Properly understood, however, the interest recognized by the Court of Appeals does find

support in other cases and does not require any court to guarantee that a defendant develop a rapport with his attorney.

## A

We have recognized repeatedly the central role of the defendant's right to counsel in our criminal justice system. See, *e. g.*, *Holloway* v. *Arkansas*, 435 U. S. 475 (1978); *Geders* v. *United States*, 425 U. S. 80 (1976); *Herring* v. *New York*, 422 U. S. 853 (1975); *Argersinger* v. *Hamlin*, 407 U. S. 25 (1972); *Gideon* v. *Wainwright*, 372 U. S. 335 (1963); *Chandler* v. *Fretag*, 348 U. S. 3 (1954); *Glasser* v. *United States*, 315 U. S. 60 (1942); *Powell* v. *Alabama*, 287 U. S. 45 (1932). We have described this right as "fundamental," *Gideon* v. *Wainwright, supra*, at 344, and have stated that "[t]he assistance of counsel is often a requisite to the very existence of a fair trial." *Argersinger* v. *Hamlin, supra*, at 31. In *Powell* v. *Alabama, supra*, the Court stated:

> "The right to be heard would be, in many cases, of little avail if it did not comprehend the right to be heard by counsel. Even the intelligent and educated layman has small and sometimes no skill in the science of law. If charged with crime, he is incapable, generally, of determining for himself whether the indictment is good or bad. He is unfamiliar with the rules of evidence. Left without the aid of counsel he may be put on trial without a proper charge, and convicted upon incompetent evidence, or evidence irrelevant to the issue or otherwise inadmissible. He lacks both the skill and knowledge adequately to prepare his defense, even though he have a perfect one. He requires the guiding hand of counsel at every step in the proceedings against him. Without it, though he be not guilty, he faces the danger of conviction because he does not know how to establish his innocence." *Id.*, at 68–69.

Given the importance of counsel to the presentation of an effective defense, it should be obvious that a defendant has

an interest in his relationship with his attorney. As we noted in *Faretta* v. *California*, 422 U. S. 806, 834 (1975), "[t]he right to defend is personal." It is the defendant's interests, and freedom, which are at stake. Counsel is provided to assist the defendant in presenting his defense, but in order to do so effectively the attorney must work closely with the defendant in formulating defense strategy. This may require the defendant to disclose embarrassing and intimate information to his attorney. In view of the importance of uninhibited communication between a defendant and his attorney, attorney-client communications generally are privileged. See *Upjohn Co.* v. *United States*, 449 U. S. 383, 389 (1981). Moreover, counsel is likely to have to make a number of crucial decisions throughout the proceedings on a range of subjects that may require consultation with the defendant. These decisions can best be made, and counsel's duties most effectively discharged, if the attorney and the defendant have a relationship characterized by trust and confidence.[4]

In recognition of the importance of a defendant's relationship with his attorney, appellate courts have found constitutional violations when a trial court has denied a continuance that was sought so that an attorney retained by the defendant could represent him at trial.

---

[4] The American Bar Association Standards for Criminal Justice state that "[d]efense counsel should seek to establish a relationship of trust and confidence with the accused." ABA Standards for Criminal Justice 4–3.1(a) (2d ed. 1980) (hereinafter ABA Standards). The Standards also suggest that "[n]othing is more fundamental to the lawyer-client relationship than the establishment of trust and confidence." *Id.*, at 4·29 (commentary).

In *Linton* v. *Perini*, 656 F. 2d 207 (CA6 1981), the court stated that "[b]asic trust between counsel and defendant is the cornerstone of the adversary system and effective assistance of counsel." *Id.*, at 212. Similarly, in *Lee* v. *United States*, 98 U. S. App. D. C. 272, 235 F. 2d 219 (1956), the court stated that " '[t]he relationship between attorney and client is highly confidential, demanding personal faith and confidence in order that they may work together harmoniously.' " *Id.*, at 274, n. 5, 235 F. 2d, at 221, n. 5 (citation omitted).

In *Releford* v. *United States*, 288 F. 2d 298 (CA9 1961), the attorney retained by the defendant was hospitalized. Instead of granting a continuance so that either the retained attorney could represent the defendant at trial or the defendant could secure substitute counsel of his choice, the trial judge ordered another attorney to represent the defendant over the defendant's objections and in the face of the second attorney's reluctance. *Id.*, at 299–301. The Court of Appeals reversed the defendant's conviction because the defendant had been deprived of the assistance of counsel of his own choice. *Id.*, at 301–302.

In *Gandy* v. *Alabama*, 569 F. 2d 1318 (CA5 1978), the Court of Appeals found that the defendant had been denied due process when the state trial court denied a continuance and forced the defendant to go to trial with an attorney other than the one he had retained. In the court's view, "the trial was rendered fundamentally unfair when [the defendant] was effectively denied his right to choose his counsel." *Id.*, at 1327. See also *Linton* v. *Perini*, 656 F. 2d 207, 209–211 (CA6 1981); *United States* v. *Seale*, 461 F. 2d 345, 356–361 (CA7 1972); *Lee* v. *United States*, 98 U. S. App. D. C. 272, 274, 235 F. 2d 219, 221 (1956). Cf. *United States* v. *Burton*, 189 U. S. App. D. C. 327, 330–334, 584 F. 2d 485, 488–492 (1978); *Giacalone* v. *Lucas*, 445 F. 2d 1238, 1240 (CA6 1971).

Admittedly, the cases discussed above involved retained rather than appointed counsel. This ground of distinction, however, is not sufficient to preclude recognition of an indigent defendant's interest in continued representation by a particular attorney who has been appointed to represent him and with whom the defendant has developed a relationship. Nothing about indigent defendants makes their relationships with their attorneys less important, or less deserving of protection, than those of wealthy defendants. As was stated in a different context in *Griffin* v. *Illinois*, 351 U. S. 12 (1956), "[t]here can be no equal justice where the kind of trial a man gets depends on the amount of money he has." *Id.*, at 19

(plurality opinion). Undoubtedly, we must accept the harsh reality that the quality of a criminal defendant's representation frequently may turn on his ability to retain the best counsel money can buy. But where an indigent defendant wants to preserve a relationship he has developed with counsel already appointed by the court, I can perceive no rational or fair basis for failing at least to consider this interest in determining whether continued representation is possible.[5]

In *Smith* v. *Superior Court*, 68 Cal. 2d 547, 440 P. 2d 65 (1968), the California Supreme Court considered a petition for a writ of mandate to compel the trial court to vacate its order removing the defendant's attorney in a pending murder trial. The court found that the trial court had no power to remove a court-appointed attorney over the objections of the defendant and the attorney even if the decision to remove the attorney was based on doubts about the attorney's compe-

---

[5] It is arguable that cases like *Releford* v. *United States*, 288 F. 2d 298 (CA9 1961), and *Gandy* v. *Alabama*, 569 F. 2d 1318 (CA5 1978), are also distinguishable from this one on the ground that they turn largely on a non-indigent defendant's right to choose his own counsel, a right that indigent defendants do not enjoy. But the considerations that may preclude recognition of an indigent defendant's right to choose his own counsel, such as the State's interest in economy and efficiency, see generally Tague, An Indigent's Right to the Attorney of His Choice, 27 Stan. L. Rev. 73 (1974), should not preclude recognition of an indigent defendant's interest in continued representation by an appointed attorney with whom he has developed a relationship of trust and confidence. To recognize this interest and to afford it some protection is not necessarily to afford it absolute protection. If a particular jurisdiction has sufficiently important interests, such as the structure of its public defender's office, which make continued representation by a particular attorney impractical, the trial judge may take this into account in balancing the defendant's interest in continued representation against the public's interests. The fact that such interests might exist in some jurisdictions, however, is not a sufficient reason to refuse to recognize that an indigent defendant has an important interest in a relationship that he might develop with his appointed attorney. There is no need to decide on this record which state interests might be sufficient to overcome an indigent defendant's interest in continued representation by a particular attorney with whom he has developed a relationship.

tence. *Id.*, at 562, 440 P. 2d, at 75. In reaching this conclusion, the court rejected the argument that because an indigent defendant does not pay for his attorney he has no cause to complain about the attorney's removal as long as the attorney currently handling his case is competent. It stated:

"But the attorney-client relationship is not that elementary: it involves not just the casual assistance of a member of the bar, but an intimate process of consultation and planning which culminates in a state of trust and confidence between the client and his attorney. This is particularly essential, of course, when the attorney is defending the client's life or liberty. Furthermore, the relationship is independent of the source of compensation, for an attorney's responsibility is to the person he has undertaken to represent rather than to the individual or agency which pays for the service. . . . It follows that once counsel is appointed to represent an indigent defendant, whether it be the public defender or a volunteer private attorney, the parties enter into an attorney-client relationship which is no less inviolable than if counsel had been retained. To hold otherwise would be to subject that relationship to an unwarranted and invidious discrimination arising merely from the poverty of the accused." *Id.*, at 561–562, 440 P. 2d, at 74 (footnote omitted).[6]

---

[6] See also *Harling* v. *United States*, 387 A. 2d 1101 (D. C. 1978). The American Bar Association Standards for Criminal Justice state that "[c]ounsel initially provided should continue to represent the defendant throughout the trial court proceedings." ABA Standards 5–5.2. The Standards also suggest that continuity of representation "affords the best opportunity for the development of a close and confidential attorney-client relationship," *id.*, at 5·54 (commentary), and reject public defender programs in which "stage" or "horizontal" representation is used. *Ibid.* Finally, the Standards state: "Representation of an accused establishes an inviolable attorney-client relationship. Removal of counsel from representation of an accused therefore should not occur over the objection of the attorney and the client." *Id.*, at 5–5.3. Based on the case law, the Standards

In light of the importance of a defendant's relationship with his attorney to his Sixth Amendment right to counsel, recognizing a qualified right to continue that relationship is eminently sensible. The Court of Appeals simply held that where a defendant expresses a desire to continue to be represented by counsel who already has been appointed for him by moving for a continuance until that attorney again will be available, the trial judge has an obligation to inquire into the length of counsel's expected unavailability and to balance the defendant's interest against the public's interest in the efficient and expeditious administration of criminal justice. Contrary to the Court's suggestion, *ante*, at 13–14, this does not require a trial court "to guarantee" attorney-defendant "rapport." The defendant's expressed desire in continued representation by a particular attorney is a clear indication that an attorney-client relationship has developed. The quality of that relationship, or the reasons that it developed, are of no concern to the court. The trial court's only duty is to inquire into the expected length of the attorney's unavailability and to determine whether the existing attorney-client relationship can be preserved consistent with society's interests. This is a minimal burden. It is one that we should readily impose in order to insure that a defendant's rights are not arbitrarily denied.

The defendant's interest in preserving his relationship with a particular attorney is not afforded absolute protection. If the attorney is likely to be unavailable for an extended period, or if other factors exist that tip the balance in favor of proceeding in spite of a particular attorney's absence,[7] the

---

go on to suggest that "[t]o hold that counsel can be removed from the case of an impecunious defendant regardless of objection from the client and attorney is to subject such an accused to unjustified discrimination based solely on poverty." *Id.*, at 5·58 (commentary). It is clear that the Standards recognize the importance of the attorney-client relationship to a defendant's right to counsel.

[7] See n. 5, *supra*.

defendant's motion for a continuance clearly may be denied. Such denials would be subject to review under the traditional "abuse of discretion" standard. As the Court of Appeals suggested, however, the balancing is critical. 649 F. 2d, at 722, n. 3. In the absence of a balancing inquiry a trial court cannot discharge its "duty to preserve the fundamental rights of an accused." *Glasser* v. *United States*, 315 U. S., at 72.

## B

After concluding that respondent had been denied his Sixth Amendment right to counsel, the Court of Appeals proceeded to consider whether a showing of prejudice was necessary to support the issuance of a writ of habeas corpus. 649 F. 2d, at 722. The Court of Appeals held that it was not. *Ibid.*[8] In reaching this conclusion, the court stated that claims of ineffective assistance of counsel, which involve specific acts and omissions of counsel, require a showing that the defendant was prejudiced by counsel's conduct before relief will be granted. *Ibid.* This case, however, did not involve an ineffective-assistance claim. *Id.*, at 722, n. 4. The claim in this case was based on the trial court's arbitrary deprivation of respondent's interest in continued representation by a particular attorney. This deprivation prevented "counsel from fulfilling normal functions—from forming and exploiting an attorney-client relationship with [respondent]." *Ibid.* As a result, the court found that this case was analogous to cases such as *Holloway* v. *Arkansas*, 435 U. S. 475 (1978), *Geders* v. *United States*, 425 U. S. 80 (1976), *Herring* v. *New York*, 422 U. S. 853 (1975), *Gideon* v. *Wainwright*, 372 U. S. 335 (1963), *Glasser* v. *United States, supra,* and *Powell* v. *Alabama*, 287 U. S. 45 (1932), in which counsel either was not provided or was prevented from discharging his normal func-

---

[8] In view of its "holding" that "there is no Sixth Amendment right to a 'meaningful attorney-client relationship,'" the Court does not reach the prejudice question. *Ante*, at 14, n. 6.

tions and in which no showing of prejudice was required. 649 F. 2d, at 723.

I find the Court of Appeals' reasoning persuasive. The same conclusion has been reached in other cases in similar contexts. See, *e. g.*, *Linton* v. *Perini*, 656 F. 2d, at 211–212; *Releford* v. *United States*, 288 F. 2d, at 302; *Harling* v. *United States*, 387 A. 2d 1101, 1106 (D.C. 1978). If an ineffective-assistance-of-counsel claim were at issue here, I might agree that a showing of prejudice was required. Requiring such a showing to support ineffective-assistance claims may be appropriate because courts are able to assess an attorney's performance and the effect of that performance on a defendant's rights based on the records before them. The courts, therefore, can make reasonable judgments regarding the presence or absence of prejudice. In cases involving claims such as the one at issue here, however, courts cannot make the same judgments. The fact that a defendant has been arbitrarily denied his interest in preserving his relationship with a particular attorney, with the result that the attorney does not appear, means that there is no record on which to base judgments regarding prejudice. We recognized this problem in *Holloway* v. *Arkansas, supra,* in the context of joint representation of conflicting interests. We stated:

> "[I]n a case of joint representation of conflicting interests the evil . . . is in what the advocate finds himself compelled to *refrain* from doing, not only at trial but also as to possible pretrial plea negotiations and in the sentencing process. It may be possible in some cases to identify from the record the prejudice resulting from an attorney's failure to undertake certain trial tasks, but even with a record of the sentencing hearing available it would be difficult to judge intelligently the impact of a conflict on the attorney's representation of a client. And to assess the impact of a conflict of interests on the attorney's options, tactics, and decisions in plea negotiations would be virtually impossible. Thus, an inquiry

into a claim of harmless error here would require, unlike most cases, unguided speculation." *Id.*, at 490–491 (emphasis in original).

In this case, there is no way to know whether the character of the proceedings would have changed, whether counsel would have made different decisions, or whether the defense strategy would have been different if Goldfine had represented respondent. Conclusions based on inquiries into such questions would amount to nothing more than "unguided speculation." Under these circumstances, it is reasonable and just not to require a showing of prejudice.[9]

## IV

While the Court of Appeals may have misread the record, its opinion reflects a thoughtful and dedicated effort to protect the rights of an indigent criminal defendant. Despite their poverty and the fact that they stand accused of a crime, indigent defendants are entitled to the enforcement of procedural rules that protect substantive rights guaranteed by the Constitution.[10] The Court of Appeals should be commended,

---

[9] There is a difference between a requirement that a defendant suffer some prejudice and a requirement that he show some specific prejudice. In this case the claim is that respondent was deprived arbitrarily of his interest in continued representation by an attorney with whom he had developed a relationship. That attorney did not represent respondent at trial. In this light, and in light of the factors discussed above, it is reasonable to assume that a trial court's arbitrary denial of a continuance produces some prejudice to the defense without requiring a specific showing of prejudice.

I would qualify the Court of Appeals' analysis in one respect. If a State could show that a defendant's attorney would have been unavailable for an extended period or that other factors existed which would have made denial of a continuance reasonable, then a trial court's failure to inquire into the length of the attorney's expected unavailability and to engage in the necessary balancing would be rendered harmless. Under these circumstances, relief should not be granted. It would no longer be reasonable to assume that the defendant had been prejudiced.

[10] Although the Court acknowledges that "inconvenience and embarrassment to witnesses cannot justify failing to enforce constitutional rights of

not criticized, for carrying out its obligation to respect this entitlement.

JUSTICE BLACKMUN, with whom JUSTICE STEVENS joins, concurring in the judgment.

The narrow question before the Court is whether the state trial judge should have inquired about the probable length of attorney Goldfine's incapacitation in order to balance respondent's right to counsel against society's interest in the prompt and efficient administration of justice. I agree with the Court that the Court of Appeals erred in construing respondent's complaints on the first day of trial as indicating a desire to be represented by Goldfine. Absent a timely request by respondent to postpone the trial until Goldfine recovered from his illness, the state trial judge had no reason to inquire into the likely length of Goldfine's unavailability. For this reason, I concur in the Court's reversal of the judgment of the Court of Appeals.

I also agree with the Court that, "[h]ad the Court of Appeals examined the record more carefully, it would have had no occasion to consider, let alone announce, a new constitutional rule under the Sixth Amendment." *Ante*, at 14. It seems to me, however, that this Court, after examining the record carefully and finding it "dispositive," *ante*, at 4, similarly has "no occasion to consider" the Sixth Amendment issue. Accordingly, I find the Court's rather broad-ranging dicta about the right to counsel and the concerns of victims (deserving of sympathy as they may be) to be unnecessary in this case.

---

an accused," *ante*, at 14, it nonetheless appears to suggest that the interests of a victim in a particular case should be considered by courts in determining whether to enforce the established rights of a criminal defendant. *Ante*, at 14–15. Such a suggestion finds no support in our cases.