[No. B007693. Second Dist., Div. Two. Dec. 14, 1984.]

WILLIAM RAY THOMAS, Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
THE PEOPLE, Real Party in Interest.

COUNSEL

Wilbur F. Littlefield, Public Defender, Laurence M. Sarnoff, Morton P. Borenstein and John Hamilton Scott, Deputy Public Defenders, for Petitioner.

No appearance for Respondent.

Robert H. Philibosian, District Attorney, Donald J. Kaplan and Arnold T. Guminski, Deputy District Attorneys, for Real Party in Interest.

OPINION

GATES, J.—On October 17, 1984, after we had initially denied defendant William Ray Thomas' petition for habeas corpus, our Supreme Court grant-

ed a hearing therein and treating it "as a petition for writ of mandate/prohibition" directed us "to issue an alternative writ to be heard . . . when the proceeding is ordered on calendar. (See *Rhinehart* v. *Municipal Court* (1984) 35 Cal.3d 772 [200 Cal.Rptr. 916, 677 P.2d 1206]; *People* v. *Cory* (1984) 157 Cal.App.3d 1094, 1098-1101 [204 Cal.Rptr. 117].)" We have complied.

So far as we can determine from our present sparse record, defendant was charged in the court below with two separate robberies, in at least one of which he allegedly had used a shotgun. On the afternoon of October 2, 1984, the 60th day following the filing of the information (see Pen. Code, § 1382), defendant was assigned to a trial department where a civil jury trial was nearing completion. There, at approximately 3:40 p.m. after each side had announced ready, the court advised the parties as follows: "All right. We have impaneled a jury for the afternoon. Because of the lateness of the hour, I'm going to proceed to put a jury together and impanel its 12 people. We will go as far as we can, go till about 4:30. Then we will continue again till tomorrow afternoon until we have a jury selected. I am in the middle of another trial, but I will give you as much time as I can to bring the case to fruition. I anticipate this case will finish around Thursday. I can go all afternoon and, unless there's some objections, on Friday, because of certain holidays."

Over defendant's objection, a panel of prospective jurors was then sworn, the information was read and voir dire examination undertaken until 4:30 p.m. The matter was then continued until 3 p.m. the following day.

When proceedings were resumed at that time, defendant renewed his objection and moved to dismiss. Unfortunately, rather than either continuing with the selection of the jury if the civil action had ended as anticipated, or granting the motion to dismiss if it had not, the court did neither, i.e., it merely acceded to defendant's request that the action be "stayed" until October 22, 1984, in order that a habeas corpus petition might be prepared which would ask an appellate court to resolve the question for it. With the law, as with life in general, half measures avail us nothing—except greater problems.[1]

---

[1]As the representative of the People correctly noted: "People in this case would strenuously oppose the issuance of a stay. We are ready to proceed to trial. The witnesses are here. The jury is here. It is my understanding that the court anticipates the civil trial to end very shortly and that it seems somewhat incongruous that we could be well-finished with this trial, if it is the defendant's speedy trial rights that we are seeking to prevent, long before the stay in this case would end. We could finish the trial. The matter could be litigated. The defendant's speedy trial rights would be much more protected by going ahead with the trial at this stage than by issuing a stay so that we can litigate whether or not he is going to get a speedy trial."

Though we realize that only the trial court possesses sufficient factual knowledge of its condition as of October 3, 1984, to resolve accurately the issue now tendered, nonetheless since this cup has been passed to us we shall attempt so far as possible to effect a retrospective analysis of its contents. To this end we have reviewed the original files in both this action and the civil action to which the court made reference. ■ Our starting point, of course, must be a reemphasis of the most fundamental fact that "the purpose of the state constitutional protection of the right to a speedy trial is 'to protect those accused of crime against possible delay, caused either by willful oppression, or the neglect of the state or its officers.' " (*People* v. *Johnson* (1980) 26 Cal.3d 557, 571 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255].) This is a right that "has its roots at the very foundation of our English law heritage. . . ." (*Klopfer* v. *North Carolina* (1967) 386 U.S. 213, 223 [18 L.Ed.2d 1, 8, 87 S.Ct. 988].)

■ "A defendant's right to a speedy trial may be denied simply by the failure of the state to provide enough courtrooms or judges to enable defendant to come to trial within the statutory period. . . . '[U]nreasonable delay in run-of-the-mill criminal cases cannot be justified by simply asserting that the public resources provided by the State's criminal-justice system are limited and that each case must await its turn.' (*Barker* v. *Wingo* [1972] 407 U.S. 514, 538 . . . White J., conc.)" (*People* v. *Johnson, supra,* 26 Cal.3d at p. 571.)

On the other hand, we need not be so artless as to suppose that every accused is in haste to have his guilt or innocence finally determined. If such truly were the case, we would be beset with petitions seeking writs of mandate to compel our busy trial courts to commence or promptly complete a determination of this question, rather than petitions seeking writs to preclude an on-going, or immediately impending, trial from resolving it.

By such observation, we do not mean to impugn in the slightest either the defendants who request such bars or their counsel. Ours is an adversary system and the dismissal of a prosecution for whatever reason may constitute no less a "victory" for an accused than his acquittal. In fact, in many instances it may be the only form of triumph offering any hope of success.

Of course, the fullness of such an accomplishment is most manifest in misdemeanor prosecutions where an acquittal and a dismissal for untimeliness are, for most practical purposes, synonymous results. The worth of the achievement, however, becomes more clouded when a felony is at hand. It may be that even if a felony defendant fully realized that a *first* dismissal would but result in his rearrest and his reentry into the criminal justice system at square one, he would still opt for such an alternative either (1) to

champion the rights of all victims of the law's delay who languish under the onus of unresolved charges for unreasonable lengths of time, or (2) in the hope that a second failure to consummate his trial might occur so that, like the misdemeanant, his avoidance of prosecution would be permanent (see Pen. Code, § 1387), or (3) simply to postpone his own day of reckoning as long as possible.

In the case now before us there is no showing that defendant was even conscious of the fact that should his present prosecution be dismissed he would remain subject to immediate reincarceration, with the attendant necessity of again being transported to and from the municipal court for arraignment and preliminary examination, the Superior Court for arraignment, pretrial conference and thereafter for each succeeding potential trial date, etcetera. Since he has not as yet made bail, such hardships would be particularly unfortunate should he ultimately be acquitted.

Considering the detailed legal instructions and admonishments that are afforded those who would concede their guilt, even when represented by able counsel, (*Boykin* v. *Alabama* (1969) 395 U.S. 238 [23 L.Ed.2d 274, 89 S.Ct. 1709]; *In re Mosley* (1970) 1 Cal.3d 913 [83 Cal.Rptr. 809, 464 P.2d 473]; *In re Tahl* (1969) 1 Cal.3d 122 [81 Cal.Rptr. 577, 460 P.2d 449]) it would not seem amiss at least to inquire concerning the awareness and wishes of those who deny it. However, regardless of the desires of a particular accused, the victims of crime, the witnesses thereto, the potential jurors, the many other defendants awaiting trial, and the public generally, are entitled to have every accused's constitutional rights applied in a *reasonable* manner.

Concerning the consideration deserved by victims and witnesses, our nation's highest judicial tribunal made the following apposite observations in *Morris* v. *Slappy* (1983) 461 U.S. 1, 14-15 [75 L.Ed.2d 610, 621-622, 103 S.Ct. 1610]: ". . . Of course, inconvenience and embarrassment to witnesses cannot justify failing to enforce constitutional rights of an accused: when prejudicial error is made that clearly impairs a defendant's constitutional rights, the burden of a new trial must be borne by the prosecution, the courts, and the witnesses; the Constitution permits nothing less. But in the administration of criminal justice, courts may not ignore the concerns of victims. Apart from all other factors, such a course would hardly encourage victims to report violations to the proper authorities; this is especially so when the crime is one calling for public testimony about a humiliating and degrading experience such as was involved here. Precisely what weight should be given to the ordeal of reliving such an experience for the third time need not be decided now; but that factor is not to be ignored by the courts. The spectacle of repeated trials to establish the truth about a

single criminal episode inevitably places burdens on the system in terms of witnesses, records, and fading memories, to say nothing of misusing judicial resources.''

Though perhaps not "a humiliating or degrading experience," it is surely no minor trauma for those who have looked down the barrel of a shotgun wielded by a man they have identified as the accused to be required repeatedly to relive their terror as it is revived again and again each time they must return to court prepared to testify, whether or not they actually do so in each instance.

Regarding the rights of jurors, in the case now before us an entire panel was sworn and then "released" for 20 days without being "dismissed." Surely those we ask to provide such a public service merit better treatment. We trust that by now they have been "dismissed" completely, lest they grow aged awaiting their opportunity to serve.

Further, but certainly not least among the particular individuals whose rights are deserving of consideration, are the many other defendants awaiting trial whose prospects for a speedy resolution of their own cases are diminished whenever another accused begins a repechage journey through our courts' congested corridors.

As to the public at large, it may be that returning to the streets untried, a number of persons whom magistrates have found probably guilty of crime, would prove an effective way to induce taxpayers and their elected representatives, to provide the revenue required to meet the costs of our extraordinarily complex criminal justice system. Still such an extreme and unhappy method of coercion should not be undertaken until we are certain that we have applied all statutory rules governing speedy trials in as reasonable a fashion as comports with due process.

We believe that each of these considerations was in our own high court's collective mind when it cited, approved and quoted extensively from our decision in *Sanchez* v. *Municipal Court* (1979) 97 Cal.App.3d 806 [159 Cal.Rptr. 91]: "In *Sanchez,* a panel of prospective jurors was sworn on the afternoon of the 45th day after arraignment. (*Sanchez, supra,* 97 Cal.App.3d at pp. 808-809.) After 12 jurors were drawn and seated in the jury box, but prior to voir dire, the judge recessed the case until the next court day. The court reconvened on January 3, 1978, and a new juror was drawn to replace one of the twelve prospective jurors who had asked to be excused. Also on that day, the case was transferred to another judge who was ready to proceed with the trial.

"In holding that the accused was 'brought to trial' within the meaning of the statute, the court in *Sanchez* expanded upon *Amati's* [*People* v. *Amati* (1976) 63 Cal.App.3d Supp. 10 (134 Cal.Rptr. 61)] 'good faith' language. Whether the trial court acted in good faith must be '*objectively* determined.' (*Sanchez, supra,* 97 Cal.App.3d at pp. 811-812, italics in orig.) Where 'the record objectively shows that a case is assigned for trial to a judge who is available to try the case and the court has committed its resources to the trial, the parties answer ready and a panel of prospective jurors is summoned and sworn, the trial process has commenced and defendant has been "brought to trial" as that term is used in Penal Code section 1382.' (*Id.,* at p. 813.) The court went on to note that it was 'not rul[ing] out the possibility that in any given case subsequent events may disclose that the court was not in fact available or ready to process the case to conclusion without unnecessary delay. In such case it could then appear that the trial had not in fact commenced.' (*Ibid.*) The court 'reiterate[d] that such a determination must be made from the objective record.' (*Ibid.*)

". . . . . . . . . . . . . . . . . . . . . .

"The *Sanchez* court's approach as to whether an accused has been 'brought to trial' gives substance to the rights embodied in section 1382. That court's approach ensures compliance with both the letter and the spirit of the statute. By not mechanically focusing only on a precise point in the proceedings but looking also to the trial court's availability and readiness to try a case, the *Sanchez* approach discourages trial courts from merely paying lip service to the legislative mandate embodied in section 1382.

"Moreover, there are sound reasons why this court should reject the *Katzman* [*People* v. *Katzman* (1968) 258 Cal.App.2d 777 (66 Cal.Rptr. 319)] court's reasoning and conclusion. First among these is the obvious circumvention of section 1382 which *Katzman* invites. If a trial court could impanel a jury and delay a trial days or even weeks, then the statutory guarantee of a speedy trial would be rendered a nullity, and an accused's rights under section 1382 would be eviscerated. This court should not encourage imaginative ways to avoid the clear intent of the Legislature as enunciated in the Penal Code.

". . . . . . . . . . . . . . . . . . . . . .

"The court in *Gonzalez* [*United States* v. *Gonzalez* (11th Cir. 1982) 671 F.2d 441] also voiced a view similar to that expressed in *Sanchez, supra,* 97 Cal.App.3d 806. Although holding that a trial commences—for the purposes of the federal Speedy Trial Act—when the court begins voir dire (671 F.2d at p. 443), the opinion cautioned that the decision should 'not be

viewed as a license to evade the Act's spirit by commencing voir dire within the prescribed time limits and then taking a prolonged recess before the jury is sworn and testimony is begun. The district courts must adhere to both the letter and the spirit of the Act, and we will not hesitate to find that a trial has not actually "commenced" within the requisite time if we perceive an intent to merely pay the Act lip service.' (*Id.*, at p. 444.)

"These principles compel the holding that an accused is 'brought to trial' within the meaning of section 1382 when a case has been called for trial by a judge who is normally available and ready to try the case to conclusion. The court must have committed its resources to the trial, and the parties must be ready to proceed and a panel of prospective jurors must be summoned and sworn.

"Under this test, it cannot be said that Mr. Rhinehart was 'brought to trial' within the meaning of section 1382. The trial judge indicated that the jury was impaneled solely to avoid a dismissal under section 1382. Moreover, the court was not available or ready to try the case to conclusion. The trial judge interrupted the trial in another case to conduct jury selection on November 27th. The next court day was November 30th, but the case was not reconvened at that time. It was continued to December 3rd or 4th or possibly later. Thus, Mr. Rhinehart was not 'brought to trial' within the meaning of section 1382." (Fns. omitted.) (*Rhinehart* v. *Municipal Court, supra,* 35 Cal.3d 772, 778-780.)

It is, of course, facile to postulate guidelines; it is their application that is delicate and difficult. For example, exactly what situations are encompassed within such expressions as: "a *prolonged* recess," "a court that is in fact available and ready to process a case to conclusion without *unnecessary* delay," or "a judge who is *normally* available and ready to try the case to conclusion"?

It has been our experience, and we sincerely hope the general practice throughout the state, that burdened criminal trial departments so husband their limited physical and temporal resources that they rarely, if ever, are completely unoccupied. To this end they must, at all times, be engaged in the disposition of numerous cases, more than one of which may be "in trial" in the broadest sense of that term. By way of example, it would be a most tragic waste indeed, if a court were precluded from commencing trial in one action merely because a jury it had instructed in another was still deliberating, though by doing so it incurred the risk that requests to rehear testimony, to receive further instructions, etcetera, might disrupt the continuity of the second proceeding. Similarly some portion of the daily calendar in every "normally available" court is given over to (1) conducting

probation and sentencing hearings in actions where guilt earlier has been determined, (2) arraigning defendants in cases newly assigned, (3) briefly interrupting the receipt of evidence in one trial in order to accept a plea in another, etcetera.

To restrict each department of our superior courts to the consideration and "trial" of one matter, *and one matter only,* would not, in our view, be either "normal" or "reasonable." On the contrary a prohibition against all overlapping would be a practice sure to create the truly *"unnecessary* delay" decried in both *Sanchez* and *Rhinehart.*

In the present instance, the court, believing that one trial was about to end, began our defendant's action even though it knew it could not direct its *entire* attention thereto immediately. If its initial premise regarding the prompt availability of its more complete resources had been correct, we believe such a course would have constituted a far preferable utilization of its facilities than a dismissal that would have but started defendant wending his way through our clogged judicial arteries anew.

Defendant, of course, does not contend that his defense would have been harmed in the slightest had his speedy trial rights been accommodated in this fashion. Of course, in truth, and quite ironically, it is an accused's very inability even to suggest a possible basis for the requisite prejudice during a trial (see *People* v. *Wilson* (1963) 60 Cal.2d 139, 149 [32 Cal.Rptr. 44, 383 P.2d 452]) that is usually urged to justify his attempt to have that trial halted by a writ proceeding. When successful, the felony defendant's *"speedy* trial rights" do but enable him to avoid *an immediate* trial in favor of one to be conducted *several months later* upon a new information.

We need not now determine whether or not we would agree with the advisory portion of the decision in *People* v. *Cory* (1984) 157 Cal.App.3d 1094, 1098 [204 Cal.Rptr. 117], since we certainly agree with the actual judgment rendered. Consequently, we will but note that it seems that in *Cory* the lower court had not even begun trial on the critical 10th day; it merely had impaneled a jury so it could "say hello" to its members and thereby avoid the risk that they might become unavailable before a later trial could actually be undertaken.

In any event, we are convinced that whenever possible our trial courts should be permitted to make the maximum and optimum use of their finite resources. Therefore, in the case now before us, we would not have found it erroneous had the court on October 3, 1984, permitted defendant's trial to progress onward toward a final conclusion if it had then determined that its initial estimates concerning its availability had proven correct. On the

other hand, if it had discovered by that date that such projections had been overly optimistic, the commandments of Penal Code section 1382 could not have been avoided by continued piecemeal proceedings.

As we stressed in *Sanchez, supra,* at page 813, "in any given case subsequent events may disclose that the court was not in fact available or ready to process the case to conclusion without unnecessary delay. . . ." When such disclosure occurs, and the accused truly wishes to be recycled, a court should promptly admit its miscalculation and dismiss the action—without regard to the potential pragmatic futility of such a course.

■  In sum, depending on the facts then known to it, the trial court in the present instance should have either dismissed defendant's action or consummated it. What it should not have done was to "stay" his fledgling trial for three weeks so that we might be asked to determine a question as to which, necessarily, we were and remain, largely unenlightened.

Even more significantly, whatever course of action any appellate court might have chanced to mandate, all hope of a truly "speedy" trial in this matter would have been lost. Further, most of the above discussed attendant hardships to this particular defendant, the victims of the charged crimes, the witnesses thereto, other defendants awaiting trial in other courts, and the public generally, already would have been realized even if the reviewing court ultimately had determined that defendant's aborted trial had not been an improvidence.

■  Nonetheless, as noted, now that the matter is before us, we have attempted so far as feasible to ascertain the status of the court's calendar at the time it granted petitioner's request for a "stay" rather than forthrightly ruling upon his motion to dismiss. Our examination of the file in the civil action to which it made reference reveals the jury there was not instructed until 4:15 p.m. on October 4, 1984. Consequently, we conclude that when viewed "objectively," albeit with hindsight, the court in this instance would not, in fact, have been one in which "a judge [was] normally available and ready to try the case to conclusion" until October 5, 1984, the third day after the statutory deadline had passed.

In this circumstance, and particularly in light of the unnecessary delay that has already occurred, we shall grant defendant the relief he requests. Further, if, as is their indicated intention, the People do elect to recharge defendant with the instant offenses, we strongly urge that they do so by dismissing the present proceeding at once without awaiting the actual issuance of a peremptory writ. That is, since defendant has been constantly in custody throughout these hearings, his second circuit through the system

should be initiated and completed as expeditiously as possible. (*People* v. *Johnson, supra,* 26 Cal.3d 557, 573.) Of course, if by now he should have changed his mind and wish to avoid further delay by being tried on the present information, his request so to do may be honored.

Let a peremptory writ of mandate issue directing the trial court to dismiss this action. This decision is final forthwith. (Cal. Rules of Court, rule 24 (c).)

Compton, Acting P. J., and Beach, J., concurred.

Petitioner's application for a hearing by the Supreme Court was denied January 24, 1985.