**[Cite as *State v. Nichols,* 2015-Ohio-350.]**

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**DARKE COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| Plaintiff-Appellee | : | C.A. CASE NO. 2014-CA-7 |
| v. | : | T.C. NO. 13CR187 |
| CORY M. NICHOLS | : | (Criminal appeal from Common Pleas Court) |
| Defendant-Appellant | : | |

. . . . . . . . . . .

**O P I N I O N**

Rendered on the 30th day of January, 2015.

. . . . . . . . . . .

R. KELLY ORMSBY, III, Atty, Reg. No. 0020615, Prosecuting Attorney, Darke County Prosecutor's Office, Courthouse, Third Floor, Greenville, Ohio 45331
Attorney for Plaintiff-Appellee

MATTHEW J. PIERRON, Atty. Reg. No. 0090473, 507 South Broadway, Greenville, Ohio 45331
Attorney for Defendant-Appellant

. . . . . . . . . . . . .

DONOVAN, J.

**{¶ 1}** This matter is before the Court on the Notice of Appeal of Cory M. Nichols, filed June 6, 2014. Nichols appeals from the trial court's May 7, 2014 judgment entry of conviction, issued following a trial by jury, on one count of aggravated robbery, in violation of R.C. 2911.01(A)(3), a felony of the first degree. Nichols received an eight year

sentence. We hereby affirm the judgment of the trial court.

**{¶ 2}** The events giving rise to this matter occurred on September 4, 2013, when Carole and Jack Coblentz went to the YMCA in Greenville, Ohio, to exercise. Carole, who was 73 years old at the time, completed her workout and returned to the couple's car in the parking lot, sometime after 7:30 a.m., to wait for Jack, who was taking a shower. Carole used her key fob to unlock the car door, and she got into the passenger side of the car and put her key into the ignition so that she could listen to the radio. Carole then heard the right rear door of the vehicle open, and she assumed that it was Jack putting his gym bag into the back seat. Carole was unable to turn her head to look into the back seat, having previously injured her neck in a car accident in 2000. Carole then felt a force from behind repeatedly slamming her head into the center console of her vehicle. She did not see her attacker, but when she exited her vehicle after the attack, with her nose bleeding heavily, she observed Nichols four to five feet from the right front of her car. Nichols asked Carole if she was okay, and she testified that she "really didn't feel like talking, and I just sat back down in the car." Carole noticed the next day that a set of car keys to a different vehicle, which had been in her purse in the back seat of the car, were missing.

**{¶ 3}** Jack testified that as he was leaving the YMCA after his shower, he noticed that his car keys, which he had left in his pants pocket in an unlocked locker, were missing. Jack had also left a money clip, with money in it, along with his wallet, in a compartment in the console of the couple's vehicle. As he approached the vehicle, he observed Carole sitting beside the car, bleeding from her nose. She told him that she did not know what happened, and that she did not want to go to the hospital. Jack, who initially thought Carole had fallen, placed his gym bag behind the driver's seat and

returned to the YMCA to see if he had dropped his keys inside the building. When he returned to the vehicle, still searching for his keys, Jack removed his gym bag, and he noticed a cell phone that did not belong to him or Carole on the floor of the backseat of the car. Jack and Carole then looked into the console of the vehicle, and they noticed that Jack's wallet and the money from the money clip were missing. Jack turned the cell phone in at the front desk at the YMCA, and the police and medics were called. Nichols, who was working out at the time, subsequently claimed the cell phone as his from the front desk.

**{¶ 4}** Detective Eric Kiryluk testified at trial that he investigated the robbery, and that in the course of his investigation, he found car keys and a wallet in a trash can in the women's restroom at the YMCA which were submitted for DNA testing. Raymond Peoples, a forensic scientist employed at the Ohio Attorney General's Bureau of Criminal Investigation, testified that he performed DNA testing on items retrieved in the course of the investigation, including the wallet found by Kiryluk and a shirt obtained from Nichols. Nichols' DNA was found on the wallet Kiryluk found in the trash can, which Jack identified as his, and Carole's DNA was found in blood present on the shirt retrieved from Nichols.

**{¶ 5}** Nichols asserts three assignments of error herein. His first assigned error is as follows:

> THE TRIAL COURT ERRED WHEN IT FAILED TO PROPERLY INQUIRE INTO DEFENDANT-APPELLANT'S ALLEGATIONS THAT HE WAS BEING INEFFECTIVELY REPRESENTED BY HIS APPOINTED COUNSEL.

**{¶ 6}** At the start of trial, the following exchange occurred:

> THE COURT: A few moments ago, Mr. Nichols conveyed to Mr.

Rohrer there was a request for a new attorney; is that right, Mr. Rohrer?

MR. ROHRER: That's correct, Your Honor.

THE COURT: Can you talk about that a little bit, Mr. Nichols, what your thoughts are.

THE DEFENDANT: It's just from day one when you gave me his card, it's been more than a hassle to get ahold of him. And really the only time I've seen him is since when you guys brought me back from being incarcerated to here. And we haven't really came eye to eye on the situation. It's been rather one-sided conversation, and I really don't know if he's taking my input serious or anything of that sort.

I have a friend, fiancé, that's been contacting another lawyer and it's around this area and he's been more in contact with her than he has. I mean, he's only talked to her, I don't know, maybe twice and she's been calling since you gave me the card non-stop and we couldn't get ahold of him. I just - - I haven't had enough time to talk to him to like to get on the same page with him. That's really it.

THE COURT: Do you remember what day it was you came back to Darke County?

THE DEFENDANT: Wednesday last week.

THE COURT: 29th or - -

CAPTAIN BRUNER: 30th.

MR. ORMSBY: I think Wednesday was the 30th.

THE COURT: So about the 30th then of April. Today is May 5th.

THE DEFENDANT: Okay.

THE COURT: Before that you were incarcerated in some part of Department of Corrections facilities, whatever it was.

MR. ROHRER: In Lebanon, Your Honor.

THE COURT: Lebanon. Thank you. The procedure that you experienced is in many respects typical because the case is being worked on while you're not in Darke County.

THE DEFENDANT: Um-hmm.

THE COURT: Now, that does at times cause issues, and I understand exactly what you're saying.

THE DEFENDNAT: Un-hmm.

THE COURT: The context is our jail has 36 beds so where we might try to have people here a lot, it doesn't always lend itself to doing that.

THE DEFENDANT: Um-hmm.

THE COURT: So I use other facilities implicitly. You being in prison is a way to manage jail population.

THE DEFENDANT: Um-hmm.

THE COURT: Mr. Rohrer and Mr. Ormsby had pretrial conversations while you weren't here necessarily.

THE DEFENDANT: Um-hmm.

THE COURT: Discovery was exchanged between the attorneys. I'm aware of this because I'm managing, if you will, the case outside your appearance. Presumably, Mr. Rohrer was sending you documents and I

think he even went to Lebanon to visit you before you came back to Darke County, right?

THE DEFENDANT: Yeah.

THE COURT: And was discovery sent along the way?

MR. ROHRER: Discovery was sent prior to that, Your Honor, and I did make one trip down there. Spent about 40, 45 minutes talking about the offers, talking about the procedure, seeing what he wanted to do in that area. We talked about that since Mr. Nichols has been back since last Wednesday. I went to see him last Wednesday evening. Last Thursday I went to see him. That was short. It was not a great meeting. Then Friday I went to see him and we talked longer. I told him I couldn't be in Saturday but I was in last night for an hour and a half. So I've been to see him four times since he's been back in preparing for trial.

I'm confused only to the point because I asked Mr. Nichols to do some things for me as far as pointing out inconsistencies he saw which we talked about last night, talked about prior. So I guess I'm confused that we're not on the same wavelength because that's not my goal. It's never my goal as a defense attorney to be on the same wavelength as the Defendant. My goal is to prepare the case and do the best job possible.

I've never from the get-go told him I would not proceed to trial in this matter. I have advised him of the evidence in the case, the strength of what I believe the Prosecutor's case was, some of the things we could argue if we went to trial. And I told Mr. Nichols early last week that if there

was a problem, he needed to get in contact with the Court, although, I didn't think the Court at this late stage would let me off the case if that was a problem. I thought we handled those problems and, of course, this morning he brought that to my attention.

Obviously, I know Paul Wagner as well as the Court knows Paul Wagner. Paul Wagner does not do felony cases for our docket right now because of the way the public defender group is run. We decided to put the two strongest attorneys on the felonies which was Randy Breaden and myself, but that's all I have.

Obviously, I feel like I am prepared to go forward at trial today. I believe my client is not happy with how I've appraised the State's case against him, but I do believe that that's my job to explain that to him with the experience I have. * * *

THE COURT: * * * The charge is aggravated robbery. Obviously, it's a serious offense. It's a first degree felony. When the case was filed, I had two options for an attorney. Mr. Breaden is a court appointed counsel for the Court and Mr. Rohrer.

THE DEFENDANT: Um-hmm.

THE COURT: By far, Mr. Rohrer has the most experience of those two lawyers and then if you stacked them up against the other criminal defense lawyers in the county, maybe not by years, although it's close.

MR. ROHRER: It is, Your Honor.

THE COURT: But by experience he's got the most experience.

Now, you have a right to retain counsel.

THE DEFENDANT: Um-hmm.

THE COURT: But when the request for appointed counsel comes in, then the Court becomes inserted into that whole process. So I gave you the most experienced criminal defense lawyer available. So at this point in time, I'm going to go with the appointment. I'm not going to grant your request for a new lawyer. It would delay the proceedings. The victim's right to a speedy trial is a factor as is yours. Everybody is out there waiting.

I always have to watch and make sure along the way that you're getting good representation. I don't get involved in tactical decision trial tactics but I do watch from a legal perspective that the minimum requirements are being fulfilled. So far I'm satisfied with that. What the lawyers have done in terms of minimum constitutional guarantees for effectiveness has occurred.

* * * I'll ask you along the way if your goals for the trial, your tactical decisions for the trial are being considered. So we'll still be talking about this along the way. So that's kind of how it all plays out.

THE DEFENDANT: I mean, I can understand that but I'm not comfortable with facing 11 years with somebody I haven't talked to. I mean, as of last night we're still trying to figure out the inconsistencies. That should have been done a long time ago. We just went over the video yesterday and there's absolutely nothing on the video. And we're still trying to find inconsistencies.

I'm the one that pointed out the inconsistencies. He had maybe five of them on a piece of paper and to me they weren't anything of importance really. I brought some more. We haven't even had time to talk about that.

THE COURT: Was there a transcript of this video provided as part of discovery or the video?

MR. ROHRER: What he's talking about, Your Honor, the video we looked at last night is the surveillance video which obviously - -

THE COURT: From the YMCA.

MR. ROHRER: From the YMCA, correct. It had no audio. It had to do with times and some things that were said, how that may play into some of the witnesses['] statements that they made. So we went over that last night to look at that.

THE COURT: * * * The request is noted, overruled. We'll watch as it goes along. You're right to talk about this ineffective assistance as an issue that comes up on appeal in cases. I don't see it directly at trial level. Court of Appeals often deals with that issue. So it's not a dead issue but for the moment it's at least closed, and we'll go forward with trial today.

And then if the trial doesn't work right, not the verdict but the process along the way, the ineffective issue can be raised. So you can complain about your attorney on appeal if necessary or even the Court's decisions. That's what the purpose of an appeal is. So those will be the decisions. * * *

**{¶ 7}** The prosecutor then discussed separate offers that were made to Nichols in

exchange for a plea of guilty, and the following exchange occurred:

MR. ORMSBY: * * *

So my understanding is that Mr. Nichols, on his own, was made aware of the offers and he chose that he did not wish to accept those offers.

THE COURT: Mr. Rohrer?

MR. ROHRER: That's correct. I did relay the offers to the Defendant. He summarily rejected them. We didn't spend a lot of time on them because Cory's mind seemed to be made up which is fine. He has the right to do that. So I didn't want to waste time talking about something he wasn't interested in and proceeded to prepare for trial.

But I did go over with him what the maximum was, what this offer was, Your Honor. I come and talked to the Court last week to see if the Court * * * would be willing to give the Defendant seven years, which was recommended, if it was recommended and accepted by my client. The Court told me last week yes. I relayed that to Mr. Nichols and he did reject that and we prepared for trial.

THE COURT: Mr. Nichols, you heard the offers. A communication of the offers did, in fact, reach you, right?

THE DEFENDANT: Um-hmm.

THE COURT: * * * Mr. Ormsby is right. You needed to hear them, not necessarily like them or do them. Anything else for the record?

MR. ORMSBY: * * * I know Mr. Nichols seems like he wanted to say something.

MR. NICHOLS: Did the Court get my letter that I wrote?

* * *

MR. ORMSBY: There was a letter - - I saw a copy of a letter from Mr. Nichols that was addressed to the Court that I assume the Clerk of Courts gave me a copy of where he was stating a few complaints about his relationship with Mr. Rohrer.

* * *

THE COURT: If there was a letter complaining of the attorney, make a copy available to the Court. * * *

If it's a complaint about your lawyer, I would want that which is why I asked Mr. Rohrer to make a copy available. So we'll mark that as an exhibit and now I'll consider it as part of the ineffective part of what is going on.

Thank you for bringing that to my attention. * * * So we'll look at it now. Okay. Anything else, Mr. Rohrer?

MR. ROHRER: No, Your Honor.

THE COURT: Okay. Let's get going. So off the record. Thank you, Tracey.

**{¶ 8}** At the conclusion of trial, in the absence of the jury, the following exchange occurred:

THE COURT: * * * Mr. Nichols, I've been trying to do a lot of things at once which includes watch the interaction between you and Mr. Rohrer. It looked typical to me. I often see both lawyers working with their client.

Mr. Ormsby was talking to Detective Kiryluk. You were talking to Mr. Rorher. That all seemed to be appropriate. But the question is whether or not you felt Mr. Rohrer was following your guidance and getting your input along the way. Did that, in fact, occur?

THE DEFENDANT: At times, yeah.

* * *

THE COURT: * * ** Was there issues that you thought were not handled the way you wanted them handled?

THE DEFENDANT: Yeah.

The court then allowed Nichols to "articulate any shortcomings you thought might have happened, whatever they might be," and those pages of the transcript, namely pages 631-634, were filed under seal.

**{¶ 9}** As this Court has previously noted:

The decision of whether to substitute counsel is within the discretion of the trial court. *Wheat v. U.S.* (1988), 486 U.S. 153, 108 S.Ct. 1692, 100 L.Ed.2d 140. See, also, *State v. Jones* (2001), 91 Ohio St.3d 335, 343-44, 744 N.E.2d 1163. Therefore, we review the trial court's decision under the abuse of discretion standard. *State v. Murphy* (2001), 91 Ohio St.3d 516, 523, 747 N.E.2d 765.

*State v. McCoy*, 2d Dist. Greene No. 2003-CA-27, 2004-Ohio-266, ¶ 6.

**{¶ 10}** This Court recently noted as follows:

"Abuse of discretion" has been defined as an attitude that is unreasonable, arbitrary or unconscionable. *Huffman v. Hair Surgeon, Inc.*,

19 Ohio St.3d 83, 87, 482 N.E.2d 1248, 1252 (1985). It is to be expected that most instances of abuse of discretion will result in decisions that are simply unreasonable, rather than decisions that are unconscionable or arbitrary.

A decision is unreasonable if there is no sound reasoning process that would support that decision. It is not enough that the reviewing court, were it deciding the issue de novo, would not have found that reasoning process to be persuasive, perhaps in view of countervailing reasoning processes that would support a contrary result. *AAAA Enterprises, Inc. v. River Place Community Urban Redevelopment Corp*., 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990).

*State v. Mitchell*, 2d Dist. Montgomery No. 25976, 2014-Ohio-5070, ¶ 13-14.

**{¶ 11}** As this Court further noted in *McCoy*:

A criminal defendant's Sixth Amendment right to competent counsel does not extend to a right to counsel of the defendant's choice. *Thurston v. Maxwell* (1965), 3 Ohio St.2d 92, 93, 209 N.E.2d 204. Nor does the right to counsel include a right to a meaningful or peaceful relationship between counsel and the defendant. *State v. Blankenship* (1995), 102 Ohio App.3d 534, 538, 657 N.E.2d 559, citing *Morris v. Slappy* (1983), 461 U.S. 1, 103 S.Ct. 1610, 75 L.Ed.2d 610.

However, a criminal defendant may discharge a court-appointed attorney when the defendant can demonstrate a break-down in the attorney-client relationship to such a degree as to endanger the defendant's

> right to effective assistance of counsel. *State v. Coleman* (1998), 37 Ohio St.3d 286, 292, 525 N.E.2d 792, paragraph four of the syllabus. Specifically, an indigent defendant is entitled to the appointment of new counsel when there is a showing of good cause, such as a conflict of interest where the conflict is so severe that the denial of substitute counsel would violate the Sixth Amendment right to counsel. *Blankenship*, supra, at 558, 657 N.E.2d 559. Alternatively, the defendant may demonstrate a complete breakdown of communication or an irreconcilable conflict which leads to an unjust result. Id. *2

*McCoy*, ¶ 7-8.

**{¶ 12}** Regarding a court's duty to inquire when a defendant alleges ineffective assistance of counsel, this Court has previously noted as follows:

> * * * In *State v. Deal* (1969), 17 Ohio St.2d 17, the Ohio Supreme Court specifically addressed the obligations of a trial court when a defendant questions the adequacy of his assigned counsel. In that case, the defendant attempted to discharge his attorney during trial, informing the court that his assigned counsel had failed to file a notice of alibi or to subpoena witnesses. The trial court rejected the defendant's complaint as "unreasonable," without making any inquiry into its merits. On appeal, the Ohio Supreme Court reversed the defendant's conviction, holding that "[w]here, during the course of his trial for a serious crime, an indigent accused questions the effectiveness and adequacy of assigned counsel, by stating that such counsel failed to file seasonably a notice of alibi or to

> subpoena witnesses in support thereof even though requested to do so by accused, it is the duty of the trial judge to inquire into the complaint and make such inquiry a part of the record." Id. at syllabus. In so ruling, the *Deal* court recognized that absent an on-the-record inquiry into the defendant's complaints, it was impossible to conduct appellate review of appointed counsel's performance. The court also recognized that "[t]he appellant, by himself, did everything he could be expected to do to preserve his objection as to the incompetency of his counsel and to the defense his counsel had prepared. His objection was specific, not vague or general." Id. at 19.
>
> In the wake of *Deal*, Ohio's appellate courts have reversed convictions when trial courts fail to make on-the-record inquiries into specific objections about the performance of court-appointed counsel. Notably, however, courts have read *Deal* as imposing on a defendant the initial burden of articulating specific concerns about his appointed counsel. Absent specific objections to counsel's performance, the trial court has no duty to investigate anything. * * *

*State v. Hibbler*, 2d Dist. Clark No. 2001-CA-43, 2002-Ohio-4464, ¶14-15.

**{¶ 13}** Nichols asserts that the matter herein is analogous to *State v. Washington*, 10th District Franklin No. 94APA11-1653, 1995 WL 373531, * 1-2 (June 20, 1995). Washington was found guilty of aggravated trafficking, and the Tenth District Court of Appeals set forth the following facts on his appeal:

> On the day of trial, prior to the jury's being empaneled, defendant advised the trial court that he had had the opportunity to speak with his

counsel on several occasions "with no good results up to this date." * * * While defendant advised that he had made every attempt to work with his attorney, his attorney had made "no solid effort to work with me on this case," as defense counsel had already concluded that defendant was guilty. * * * According to defendant, defense counsel stated to defendant that he had heard about defendant from other lawyers and public defenders and believed defendant was a "predator. He believes that I am-I am no good; and, like he told me, * * * it is people like you that makes this world what it is today. And I was-and I was what had-what was-what he had to deal with as a result of this world that I created." * * * Defendant advised that although he had tried to work with defense counsel on different occasions, his attempts ended up in an argument; that he had not even told defense counsel about his case until recently because counsel consistently contradicted defendant on every decision that defendant tried to make about the case; that defense counsel offered no advice whatsoever. When defendant asked defense counsel to remove himself from the case, counsel advised that defendant would receive a new lawyer on appeal.

Summarizing, defendant stated that he once again was requesting a new attorney so that he could receive a fair trial; that defense counsel did not "have my best interests at heart, and I do not wish to put my life at the line with this man at the helm." * * *

In response, the trial court stated that it consistently hears people disagreeing with the way their attorneys handle matters; that the court was

> aware defense counsel had actively been working on the case, as evidenced by a discovery request earlier in the year; and that the court had "no reason to believe that you could get any better attorney if I gave you another one, so I'm ready to get the thing done." * * * With that response, the trial court moved on to other matters.

**{¶ 14}** The Tenth District determined that "* * * the trial court's response to defendant's complaint about his attorney is insufficient. The trial court erred in not inquiring further into the bases for defendant's contentions, thus failing to provide in the record an opportunity for meaningful appellate review of the trial court's determination to refuse defendant new counsel." *Id*., * 2.

**{¶ 15}** We initially note that Nichols' general allegations regarding defense counsel's performance do not rise to the level of the communication breakdown or irreconcilable differences alleged in *Washington*. Further, in contrast to *Washington,* the record reflects that the trial court conducted a lengthy on-the-record inquiry into Nichols' objections about defense counsel's performance, both at the start of trial and at its conclusion. When advised that Nichols requested a new attorney, the court asked Nichols "what your thoughts are." After Nichols stated that "it's been more than a hassle to get ahold" of defense counsel, and that Nichols had not "had enough time to talk to him to like get on the same page with him," the trial court acknowledged that Nichols was incarcerated in a Lebanon prison (in Warren County), due to overcrowding at the local jail (in Darke County). The court proceeded to confirm that defense counsel visited Nichols in Lebanon, further noting that the attorneys exchanged discovery, that Nichols received the discovery, and that the attorneys engaged in pretrial conversations. The court

inquired of defense counsel regarding his contact with Nichols following Nichols' return to Darke County in preparation for trial, ascertaining that defense counsel met with Nichols four times. Defense counsel advised the court of the nature of his trial preparation, and he indicated that he felt prepared "to go forward at trial today." We note that he further advised the court that Nichols was displeased with defense counsel's assessment of the State's evidence against him, which is not a basis for the discharge of defense counsel.

**{¶ 16}** The court noted that aggravated robbery is a serious offense, and that the court appointed "the most experienced defense lawyer available" to represent Nichols. Nichols acknowledged that defense counsel made note of and discussed with him five inconsistencies between the statements of witnesses at the scene and a surveillance video from the YMCA. The record further reflects that defense counsel advised Nichols of the maximum sentence he faced, and of the offers extended by the State in exchange for his plea. Finally, the court indicated that it obtained a copy of the letter from Nichols regarding defense counsel's performance and stated that it would consider the letter. The letter is not in the record before us. The court then went off the record, and we have no basis to conclude that the court failed to read the letter, having indicated that it would do so before pausing the proceedings. Finally, we have reviewed Nichols' allegations of ineffective assistance in the portion of the transcript filed under seal, and we agree with the court's assessment therein, that Nichols again raised "issues we talked about prior to the commencement of the case."

**{¶ 17}** Since the trial court conducted a thorough inquiry regarding Nichols' allegations of ineffective assistance, and since Nichols did not allege a severe conflict of interest, a complete breakdown of communication, or an irreconcilable conflict, an abuse

of discretion is not demonstrated, and Nichols' first assigned error is overruled.

**{¶ 18}** Nichols' second and third assigned errors allege that he received ineffective assistance of counsel. They are as follows:

> APPELLANT BELIEVES HE WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL FOR TRIAL COUNSEL'S FAILURE TO CHALLENGE JUROR [H.] FOR CAUSE.

And,

> APPELLANT BELIEVES HE WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL BY TRIAL COUNSEL'S FAILURE TO PURSUE THE POSSIBILITY THAT A THIRD PARTY WAS RESPONSIBLE FOR THE ROBBERY.

**{¶ 19}** As this Court has recently noted:

> "We review the alleged instances of ineffective assistance of trial counsel under the two prong analysis set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and adopted by the Supreme Court of Ohio in *State v. Bradley* (1989), 42 Ohio St.3d 136, * * *. Pursuant to those cases, trial counsel is entitled to a strong presumption that his or her conduct falls within the wide range of reasonable assistance. *Strickland*, 466 U.S. at 688. To reverse a conviction based on ineffective assistance of counsel, it must be demonstrated that trial counsel's conduct fell below an objective standard of reasonableness and that his errors were serious enough to create a reasonable probability that, but for the errors, the result of the trial would have been different. *Id.* Hindsight is not permitted

> to distort the assessment of what was reasonable in light of counsel's perspective at the time, and a debatable decision concerning trial strategy cannot form the basis of a finding of ineffective assistance of counsel." (Internal citation omitted). *State v. Mitchell*, 2d Dist. Montgomery No. 21957, 2008–Ohio–493, ¶ 31.
>
> An appellant is not deprived of effective assistance of counsel when counsel chooses, for strategic reasons, not to pursue every possible trial tactic. *State v. Brown*, 38 Ohio St.3d 305, 319, 528 N.E.2d 523 (1988). The test for a claim of ineffective assistance of counsel is not whether counsel pursued every possible defense; the test is whether the defense chosen was objectively reasonable. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). A reviewing court may not second-guess decisions of counsel which can be considered matters of trial strategy. *State v. Smith*, 17 Ohio St.3d 98, 477 N.E.2d 1128 (1985). Debatable strategic and tactical decisions may not form the basis of a claim for ineffective assistance of counsel, even if, in hindsight, it looks as if a better strategy had been available. *State v. Cook*, 65 Ohio St.3d 516, 524, 605 N.E.2d 70 (1992).

*State v. Saini*, 2d Dist. Greene No. 2013 CA 36, 2014-Ohio-5582, ¶ 47-48.

**{¶ 20}** Regarding Juror H., in the course of voir dire, H. raised his hand and remarked, "* * * I done this once before, and I was excused. That comes back to my mind and it's confidential." The court responded, "* * *I'm going to hold on to that and deal with it." Defense counsel subsequently indicated to the venire as follows:

* * *

I grew up in an all white community in Pennsylvania, Lancaster County * * *. Went to college in Indiana and then came to Akron, Ohio. Akron, Ohio, is where I first had my first friendships with African Americans, okay. Had about 20, 25 percent in Akron.

* * *

Then I came down here in ’95, and I can still say there’s one person on my street that has the same thing. I notice there’s a number of people that had African American lawn jockeys in their lawn. I see some of you smiling. It shocked me because up in Akron that be would (sic) considered pretty racist to do. I still have some people on my street that has one. Don’t quite understand.

**{¶ 21}** The trial court later asked H. if he wished to speak to the court and attorneys confidentially, and he responded affirmatively, noting, “Your lawn jockey thing. Off the record I can explain that.” The following exchange occurred outside of the presence of the jury:

[MR. H.]: Years ago I made a wrong statement I guess when I was seated and said that the guy was Mexican and he was guilty in my mind. I told that privately so that bothers my mind, and I really wanted to tell everybody that so that nobody thought what - - I’m not prejudice (sic) but that comes up in my mind when you asked me.

THE COURT: How long ago was that statement?

MR. [H.]: I don’t know. One of the jury duties I got seated.

Probably ten years ago maybe.

THE COURT: Do you feel that way today?

MR. [H.]: Not really.

THE COURT: Okay.

MR. [H.]: Not really.

THE COURT: Is race an issue on how you vote on this case?

MR. [H.]: No. I just wanted to say that because you mentioned it in the conversation there, and that's the reason why I said I wanted to do it privately.

THE COURT: Any other issues you thought needed to be talked about confidentially?

MR. [H.]: No.

* * *

MR. ROHRER: I do have a question. Can you explain, Mr. [H.], why you made that statement at the time because there's lots of reason[s] you may have. Did you make it because you didn't want to sit on the jury? Did you make it because you - -

MR. [H.]: I wasn't - - I didn't want to sit on the jury. At the place where the drug deal had been done, I was familiar with the owner and financial dealings with him, the owner. Not the one that done the - - not the one the police was pursuing.

MR. ROHRER: And was the owner Hispanic?

MR. [H.]: No.

MR. ROHRER: * * * I guess I'm still questioning why did you say you might have trouble because he's Mexican?

MR. [H.]: At that time, I guess my views wasn't as broad as they are now about - - I was raised when - - in the '60s when it was more of a problem, and I guess I've changed my thinking as I progressed, went along in life.

MR. ROHRER: And you can understand why my client could be concerned about that.

MR. [H.]: That's the reason why I said what I said.

MR.ROHRER: And I appreciate that.

* * *

**{¶ 22}** Crim.R. 24(C)(9) and R.C. 2945.25(B) provide that a prospective juror may be challenged for the following cause: that the juror "is possessed of a state of mind evincing enmity or bias toward the defendant * * *."

**{¶ 23}** Based upon the above exchange, we cannot conclude that defense counsel was ineffective in failing to challenge H. for cause. As the State asserts, the record reflects that defense counsel "did exercise all four peremptory challenges to excuse other potential jurors, and apparently made the tactical decision that Mr. [H.] was less of a problem than those four." H. candidly brought his previous experience as a prospective juror to the attention of defense counsel and the court, acknowledging that he was excused from jury duty in that case as the result of commenting that the defendant's Hispanic ethnicity convinced him of the defendant's guilt, a comment that H. himself characterized as a "wrong statement." H. expressly told the court that over time he

"changed my thinking," and that race would not influence his vote. Based upon H.'s statements to the court, we find no basis to conclude that he was "possessed of a state of mind evincing enmity or bias toward" Nichols. Defense counsel further questioned H. regarding his reasons for making the statement, and he was clearly satisfied with H.'s responses. Since defense counsel's performance did not fall below an objective standard of reasonableness in failing to challenge H. for cause, and since prejudice is not demonstrated, Nichols' second assigned error is overruled.

**{¶ 24}** Regarding his third assigned error, Nichols directs our attention to a police report that is attached to his brief. Nichols asserts, "according to Sergeant Drew of the Greenville Police Department in the Police Report * * * as Appellant was lead out of the YMCA on the day of the investigation, he told a YMCA employee to 'call Randy.'" Nichols asserts that Drew learned from a YMCA employee that "Randy Ward came to the YMCA after the police investigated the facility and that he 'loitered around the locker room then wrapped his hand in his t-shirt and touched the lock on the community locker the suspect had utilized today.'" According to Nichols, "trial counsel's failure to investigate or develop Randy Ward's involvement in the robbery resulted in deficient representation and deprived Appellant of a fair trial. More specifically, trial counsel failed to elicit the activities of Randy Ward from Drew while he was testifying." Nichols asserts that he "was denied a fair trial because his trial counsel failed to develop and build upon the suspicious activity of Randy Ward, as set forth in Sergeant Drew's police report."

**{¶ 25}** We note that the police report was not admitted into evidence, and it is not part of the record before us for purposes of appeal. *See* App.R. 9. Given the overwhelming evidence of Nichols' guilt, namely that Carole observed Nichols a few feet

from her car moments after the robbery, that Carole was attacked from behind and Nichols' phone was found on the floor in the back seat of the couple's car, that Carole's DNA was found on a spot of blood on Nichols' shirt, and that Nichols' DNA was found on Jack's wallet, we cannot conclude that defense counsel's failure to pursue the possibility that a third party was responsible for the robbery fell below an objective standard of reasonableness, or that such a strategy would have altered the outcome of the trial. Finally, we note that Ward's alleged actions occurred after the fact of the robbery, and we conclude that defense counsel may have made a strategic decision not to adduce evidence regarding Ward's alleged conduct, since it could be construed as an attempt to remove any fingerprints left behind by Nichols in order to conceal Nichols' guilt. For the foregoing reasons, Nichols' third assignment of error is overruled, and the judgment of the trial court is affirmed.

. . . . . . . . . .

FROELICH, P.J. and HALL, J., concur.

Copies mailed to:

R. Kelly Ormsby, III
Matthew J. Pierron
Hon. Jonathan P. Hein