[Cite as *State v. Pate*, 2024-Ohio-5769.]

# IN THE COURT OF APPEALS OF OHIO
## ELEVENTH APPELLATE DISTRICT
## LAKE COUNTY

STATE OF OHIO,

        Plaintiff-Appellee,

- vs -

DEMARKES T. PATE,

        Defendant-Appellant.

**CASE NO. 2024-L-019**

Criminal Appeal from the
Court of Common Pleas

Trial Court No. 2023 CR 001201

---

**O P I N I O N**

Decided: December 9, 2024
Judgment: Affirmed

---

*Charles E. Coulson*, Lake County Prosecutor, and *Kristi L. Winner*, Assistant Prosecutor, Lake County Administration Building, 105 Main Street, P.O. Box 490, Painesville, OH 44077 (For Plaintiff-Appellee).

*Michael A. Partlow*, P.O. Box 1562, Stow, OH 44224 (For Defendant-Appellant).

ROBERT J. PATTON, J.

{¶1}   Defendant-appellant, Demarkes Pate ("appellant"), appeals his conviction of possession of cocaine, a second-degree felony, in the Lake County Court of Common Pleas.

{¶2}   On appeal, appellant argues that the trial court erred when it denied his motion to suppress and declined to remove trial counsel and appoint new counsel. He also argues that his conviction is against the manifest weight of the evidence.

{¶3} Upon review of the record, we conclude that the trial court properly denied appellant's motion to suppress as law enforcement officers had probable cause to arrest appellant. The drugs were found on appellant during a search incident to arrest.

{¶4} We further hold that the trial court did not abuse its discretion when it denied appellant's request to remove and replace his court appointed trial counsel when he failed to establish a conflict of interest, a complete breakdown of communication, or an irreconcilable conflict between appellant and his counsel.

{¶5} Finally, appellant's conviction of possession of cocaine is consistent with the manifest weight of the evidence. After arrest, appellant was found to be in possession of a plastic bag containing a white powder. The white powder tested positive for cocaine and the mixture weighed in excess of twenty grams, but less than twenty-seven grams. Appellant, who testified at trial, admitted that the powder in his pocket included cocaine. As such, the jury did not lose its way when it convicted appellant of possession of cocaine.

{¶6} The judgment of the Lake County Court of Common Pleas is affirmed.

## Substantive and Procedural History

{¶7} On December 8, 2023, the Lake County Grand Jury returned a two-count indictment charging appellant with possession of cocaine, a second-degree felony, in violation of R.C. 2925.11(A)(C)(4)(d) ("Count 1") and aggravated menacing, a misdemeanor of the first-degree, in violation of R.C. 2903.21(A) ("Count 2").[1]

{¶8} Arraignment was held on December 13, 2023. Appellant, through trial counsel, filed his motion to suppress the same day seeking suppression of all evidence obtained upon his arrest and subsequent search incident to his arrest. The State filed its

---

1. This case was bound over from the Willoughby Municipal Court on November 15, 2023.

Case No. 2024-L-019

response on January 3, 2024. Within the memorandum, the State also sought permission to supplement their memorandum based on the Ohio Supreme Court's decision *State v. Randolph*, 2023-Ohio-4753. The trial court granted the extension. The State filed their supplemental memorandum in opposition to appellant's motion to suppress on January 8, 2024.

{¶9} A suppression hearing was held on January 10, 2024. The State presented two witnesses, Officer Jeremy Blackstone of the City of Willoughby Police Department ("Officer Blackstone") and Detective Gabriel Sleigh ("Detective Sleigh"), and two exhibits, the lease agreement and the dash cam video at the hearing. However, the lease agreement was not admitted for purposes of the suppression hearing.

{¶10} The trial court subsequently denied the motion to suppress in its entirety. The matter proceeded to a jury trial on February 5, 2024.

{¶11} The following facts were presented at the jury trial:

{¶12} Kevin Corkan ("Corkan") lives in an apartment in Building 1343 of the Fox Run Apartments located in Lake County, Ohio. According to Corkan, appellant lived in the apartment building across from Corkan's and that the pair would occasionally smoke outside. A few days before September 28, 2023, Corkan had suspected that appellant had stolen some money from him and reported the theft.

{¶13} Corkan testified that at around 9:30 in the morning on September 28, 2024, appellant pounded on Corkan's door. Corkan testified that he came out into the hallway to talk to appellant who was demanding Corkan retract his statement about his suspicions regarding appellant's involvement in a theft. Corkan declined to do that. At some point, a neighbor named Valencia also came into the hallway. According to Corkan, appellant

3

clenched his fist and looked like he was going to punch Corkan but stopped. When appellant was leaving, Corkan testified that appellant claimed he used to be in a gang that would kill people for involving the police. Corkan asked if appellant was saying he was going to kill him, and Corkan testified that appellant shrugged and nodded his head affirmatively.

{¶14} Corkan testified he placed a 911 call after appellant threatened him on September 28, 2023. He testified that the police arrived quickly and subsequently detained appellant.

{¶15} Kimbery Kaste, a police and ambulance dispatcher for the City of Willoughby, took the 911 call from Kevin Corkan. The 911 recording was admitted as State's Exhibit 1 and played for the jury. The 911 recording establishes that Corkan called 911 after an individual named "D" threatened his life twice. He indicated that "D" was at the apartment building across from his building.

{¶16} Detective Sleigh testified that he, along with Detective David Burrington ("Detective Burrington"), were at the Fox Run Apartments Leasing Office inquiring about the theft report when they heard dispatch over the radio requesting officers to respond to a Fox Run Apartments. Detectives responded to Corkan's apartment and Officer Blackstone arrived shortly thereafter. Officers, including the detectives, were not equipped with body-worn cameras. However, Officer Blackstone activated his dash cam which has a body-worn audio recorder, which captured audio of encounters at the Fox Run Apartments. The dash cam recording was admitted as State's Exhibit 2.

{¶17} Detective Sleigh testified that he and Detective Burrington took statements from Corkan about the threats and identified appellant as the individual who made the

4

threatening comments. After taking Corkan's statement, officers went to the apartment that Corkan identified as appellant's apartment. Appellant was inside and was arrested for aggravated menacing. Detective Sleigh testified that after appellant was handcuffed, Officer Blackstone conducted a pat down search of appellant's person and located a plastic bag containing white powder. Detective Sleigh testified that appellant told officers the bag contained powdered sugar. The plastic bag contained cocaine that was admitted as State's Exhibit 3.

{¶18} Officer Kevin Rastall of the Willoughby Police Department ("Officer Rastall") retrieved the plastic bag of white powder from Detective Sleigh, and took it to the police department to be processed as evidence. Officer Rastall placed the bag and its contents into an evidence bag, sealed the bag, and labeled it. The labeled evidence was then stored in an evidence locker for transportation to the laboratory.

{¶19} William Koubek ("Koubek"), a supervisor of chemistry and toxicology at the Lake County Crime Laboratory, received the evidence package including the plastic bag of white powder from the Willoughby Police Department. Koubek determined that the white powder contained in the plastic bag was 26.51 grams of cocaine.

{¶20} Appellant also testified on his own behalf. Appellant testified that officers repeatedly told him he was being charged with trespass and that the officers violated his constitutional rights. He further admitted that the white powder was cocaine.

{¶21} At the conclusion of trial, the jury convicted appellant of possession of cocaine, as charged in Count 1 of the indictment. The jury also found that the weight of the cocaine was greater than 20 grams but less than 27 grams. Further, appellant was found "not guilty" of aggravated menacing as charged in Count 2. A presentence

5

Case No. 2024-L-019

investigation ("PSI") and a drug and alcohol evaluation were ordered to be completed prior to sentencing.

{¶22} On February 28, 2024, the trial court sentenced appellant to an indefinite prison term of four years to a maximum term of six years, a mandatory fine of $5,000 and costs. After the trial court announced its sentence, defense counsel moved for a bond pending an appeal which was denied by the trial court.

{¶23} Appellant appeals and raises the following assignments of error for review:

> [1.] "The trial court erred in denying appellant's motion to suppress of all evidence against him, in violation of this rights pursuant to the Fourth Amendment to the United States Constitution."
>
> [2.] "The trial court erred and abused its discretion by denying appellant's various requests to remove his appointed counsel and appoint replacement counsel."
>
> [3.] "Appellant's conviction is against the manifest weight of the evidence."

## Motion to Suppress

{¶24} "Appellate review of a motion to suppress presents a mixed question of law and fact." *State v. Burnside*, 2003-Ohio-5372, ¶ 8. "[T]he trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses." *Id.* citing *State v. Mills*, 62 Ohio St. 3d 357. We must accept the trial court's findings of fact if they are supported by competent, credible evidence, and then independently decide whether those facts satisfy the applicable legal standards without deference to the trial court's decision. *Id.* "Once an appellate court determines whether the trial court's factual findings are supported by the record, the court must then engage in a de novo review of the trial court's application of the law to those facts." *State*

6

*v. Eggleston*, 2015-Ohio-958, ¶ 18 (11th Dist.), citing *State v. Lett*, 2009-Ohio-2796, ¶ 13 (11th Dist.).

**{¶25}** The following testimony was presented at the suppression hearing:

**{¶26}** Officer Blackstone testified that at approximately 2:00 p.m. on September 28, 2023, he was dispatched to the Fox Run Apartments to investigate a possible theft offense and disturbance. The property manager was requesting that appellant be removed from the premises. The Fox Run complex consists of multiple buildings. Officer Blackstone activated his dash cam video recorder which also captures audio from a body-worn microphone.

**{¶27}** Upon arrival at the apartment complex, Officer Blackstone went to the management office. The property manager, an employee, and appellant were inside the office. Officer Blackstone testified he recognized appellant, having personally encountered appellant earlier on September 28, 2023, in downtown Willoughby. Appellant had previously been arrested and cited for disorderly conduct as a result of a domestic argument between appellant and his mother.

**{¶28}** Officer Blackstone testified that appellant became upset when appellant saw the officer and started swearing. The property manager wanted appellant banned from the building and advised that appellant was not a tenant. The property manager told appellant to retrieve any personal belongings and to leave the apartment complex. Officer Blackstone then left the apartment complex.

**{¶29}** Approximately an hour later, Officer Blackstone testified that he was called back to the complex due to a complaint from a male stating someone had threatened to kill him. While enroute to the complex, Officer Blackstone received a call from detectives,

7

who were presently at the complex investigating the theft of a large sum of cash. Detective Sleigh testified that he and Detective Burrington were at the leasing office following up on a burglary report filed by the caller, Kevin Corkan, two days prior. The detectives indicated they would meet Officer Blackstone at Building 1343.

{¶30} Officer Blackstone testified that he responded to Building 1343 to speak with Corkan. Upon arrival at Corkan's second floor apartment, Officer Blackston and Detective Sleigh indicated that Corkan appeared upset and shaken. Corkan reported that appellant, the individual who allegedly stole his cash, verbally threatened him and told him that "people get killed for this kind of stuff." Corkan reported that appellant was clenching his fist like he was going to hit him. When Corkan asked if appellant was threatening to kill him, Corkan reported to police that appellant nodded his head, shrugged his shoulders, and said he was in a gang in Cleveland. Corkan provided officers and detectives with information regarding appellant's whereabouts in the complex and that appellant was with appellant's sister in Building 1345.

{¶31} According to Officer Blackstone, when he arrived at the apartment identified by Corkan, the detectives were standing outside of the apartment door talking with appellant who was standing in the doorway. Officer Blackstone, recognizing the appellant from his earlier encounters with him, asked appellant to step into the hallway. According to Officer Blackstone and Detective Sleigh, appellant gave a concerned look like he might not comply with the officer's request. Officer Blackstone then grabbed appellant's arm and brought him into the hallway. Officer Blackstone and Detective Sleigh testified that they did not enter the apartment.

8

{¶32} Appellant was arrested and was searched incident to his arrest. During the search officers discovered a bag of white powder in appellant's front pocket consistent with a controlled substance.

{¶33} After appellant's arrest, Detective Sleigh went back to the Fox Run Apartments and obtained a copy of the lease for the apartment appellant was inside of with his sister. The lease was not admitted as an exhibit for the purposes of the suppression hearing.

{¶34} On January 29, 2024, the trial court denied the motion to suppress and concluded that officers had probable cause to arrest appellant for trespass *and* for aggravated menacing.

{¶35} Appellant takes issue with the trial court's conclusion that the officers had probable cause to arrest appellant on the trespassing charge. He argues that the trial court ignored the Ohio Supreme Court's decision in *State v. Randolph*, 2023-Ohio-4753 wherein the Court held that "a landlord or landlord's agent, without first reserving the authority to do so in the lease agreement for the property, may not prohibit a person from entering onto the property such that a tenant is prohibited from inviting that person onto the property." *Id.* at ¶ 22.

{¶36} The trial court determined *Randolph* to be inapplicable because the decision "came out three months after appellant's arrest and law enforcement had no reason to anticipate the decision." In other words, officers, one of which was present earlier in the day when appellant was told to gather his personal belongings and leave, had a good faith belief that appellant's refusal to do so amounted to a criminal trespass.

9

Case No. 2024-L-019

**{¶37}** This Court finds *Randolph* distinguishable from the case sub judice for several reasons. First, the *Randolph* Court analyzed the sufficiency of evidence to support a conviction of trespass. It does not discuss probable cause or an alleged Fourth Amendment violation. Moreover, it is factually distinct as this case is not premised solely on an alleged trespass. Instead, this case involves both trespass *and* aggravated menacing. Therefore, even if the officer lacked probable cause to arrest appellant for trespassing pursuant to *Randolph*, officers had probable cause to arrest appellant on the aggravated menacing charge. "Probable cause to arrest depends 'upon whether, at the moment the arrest was made ... the facts and circumstances within [the arresting officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense.'" *State v. Norris*, 1999 WL 1000034, *2 (2d Dist. Nov. 5, 1999), quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964).

**{¶38}** In this case, officers had Corkan's report and statement that appellant threatened to kill him after Corkan accused appellant of theft. This constitutes reasonable, trustworthy information for officers to believe that appellant committed the offense of aggravated menacing.

**{¶39}** Further, R.C. 2935.03(B)(1) provides  in relevant part: "[w]hen there is reasonable ground to believe that an offense of violence * * * has been committed within the limits of the political subdivision  * * * in which the peace officer is appointed, employed, or elected or within the limits of the territorial jurisdiction of the peace officer, a peace officer described in division (A) of this section may arrest and detain until a warrant can be obtained any person who the peace officer has reasonable cause to

10

believe is guilty of the violation." Pursuant to R.C. 2901.01(A)(9)(a), Aggravated Menacing is an offense of violence.

{¶40} As such, officers could arrest and detain appellant without a warrant on the aggravated menacing in accordance with R.C. 2935.03(B)(1).

{¶41} "An officer who makes a lawful arrest may conduct a warrantless search of the arrestee's person and of the area 'within his immediate control.'" *State v. Adams*, 2015-Ohio-3954, ¶ 182, quoting *Chimel v. California*, 395 U.S. 752, 763, (1969). "The search-incident-to-arrest exception has two rationales: protecting arresting officers and safeguarding evidence that the arrestee might conceal or destroy." *Id.*, citing *Arizona v. Gant*, 556 U.S. 332, 339 (2009). *State v. Washington*, 2023-Ohio-4484, ¶ 60 (11th Dist.).

{¶42} As determined above, officers lawfully arrested appellant. In conducting a proper warrantless search of his person, officers discovered the cocaine. Therefore, upon review, we conclude that the trial court's denial of appellant's motion to suppress was proper.

{¶43} Appellant's first assignment of error is without merit.

**Request to Remove and Replace Appointed Trial Counsel**

{¶44} In his second assignment of error, appellant asserts that the trial court abused its discretion when it denied appellant's request to remove and replace his appointed trial counsel. We disagree.

{¶45} Appellant made several pro se requests to remove and replace his appointed counsel through the public defender's office. Appellant cites two of those requests in this appeal.

11

Case No. 2024-L-019

{¶46} First, on December 7, 2023, prior to the indictment being filed, appellant filed a motion to remove the Lake County Public Defender's Office from his case. He alleged that his mother and the director had a personal relationship. Specifically, his mother had taken a course as a student where the director was the instructor. He did not allege how such a relationship with the director of the office, who did not serve as appellant's counsel, was problematic. The motion was denied on December 11, 2023.

{¶47} Second, on the day of trial, the trial court acknowledged appellant made a second pro se request to remove counsel. The trial court indicated at the hearing that appellant's request was a handwritten letter-like pleading that was believed to have been filed with the clerk of courts. However, upon review of the docket, it does not appear to have been filed. Appellant explained that he was dissatisfied with his appointed counsel and felt that she did not address important details and facts at the suppression hearing or throughout the case and failed to subpoena body worn camera recordings. However, it is worth noting that no such recording existed as the Willoughby Police Department did not have body camera devices. Appellant alleged that he included other grounds in support of his request to remove his counsel in his written "motion." However, the hand-written pleading is not part of the record before us.

{¶48} On appeal, appellant argues, without specificity, that the trial court abused its discretion when it denied appellant's request to remove and replace appointed counsel.

{¶49} It is well established that "an indigent defendant has a right to competent counsel, not a right to counsel of his own choosing." *State v. Blankenship*, 102 Ohio App.3d 534, 558, (12th Dist.1995).The right to competent counsel does not require that

12

a criminal defendant develop and share a "meaningful relationship" with his attorney. *Morris v. Slappy*, 461 U.S. 1, 13-14 (1983).

{¶50} Therefore, to be entitled to the appointment of substitute counsel, an indigent defendant must establish good cause, such as an actual conflict of interest, a complete breakdown in communication, or an irreconcilable conflict which leads to an apparently unjust result. *State v. Benson*, 2021-Ohio-1013, ¶ 9 (11th Dist.), citing *Blankenship* at 558. Indeed, the Ohio Supreme Court has held that an indigent defendant must show "a breakdown in the attorney-client relationship of such magnitude as to jeopardize the defendant's right to effective assistance of counsel" to discharge a court-appointed attorney. *State v. Coleman*, 37 Ohio St.3d 286 (1988), paragraph four of the syllabus.

{¶51} As this Court recognized in *Benson*, "the conflict must be so severe that a denial of substitution of counsel would implicate a violation of the Sixth Amendment right to counsel. *Benson* at ¶ 10 quoting *Blankenship* at 558." Therefore, where there is no Sixth Amendment concern present, "the decision of a trial court to refuse substitution of counsel will be reversed only if the court has abused its discretion." *Benson*, citing *State v. Pruitt*, 18 Ohio App.3d 50, 57 (8th Dist.1984).

{¶52} While appellant may be dissatisfied with the outcome of the suppression hearing, appellant presented nothing to the trial court that suggested a conflict of interest, a complete breakdown in communication, or an irreconcilable conflict between appellant and his counsel. As such, he was not entitled to replacement counsel and the trial court did not abuse its discretion when it denied appellant's request.

{¶53} His second assignment of error is without merit.

13

**Manifest Weight**

{¶54} In his third and final assignment of error, appellant argues that his conviction for possession of cocaine is against the manifest weight of the evidence. We disagree.

{¶55} "[W]eight of the evidence addresses the evidence's effect of inducing belief." *State v. Wilson*, 2007-Ohio-2202, ¶ 25. "In other words, a reviewing court asks whose evidence is more persuasive—the state's or the defendant's?" *Id*. "'The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [factfinder] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). "'When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a 'thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony.'" *Id.*, *quoting Tibbs v. Florida*, 457 U.S. 31, 42 (1982). "'The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.'" *Id.*, quoting *Martin* at 175.

{¶56} Appellant was convicted of possession of cocaine, a second degree felony, in violation of R.C. 2925.11 (A)(C)(4)(d). R.C. 2925.11(A) provides: "that [n]o person shall knowingly obtain, possess, or use a controlled substance or a controlled substance analog." Subsection (C)(4) which is specific to cocaine, details the degree of the offense based upon the weight of cocaine involved. In this case, appellant was convicted of

14

possessing cocaine which equaled or exceeded twenty grams but was less than twenty-seven grams of cocaine. R.C. 2925.11(C)(4)(d).

{¶57} Appellant argues that "it was uncontroverted that police authorities were unable to determine whether a legally significant amount of cocaine existed in the powder recovered, versus the plethora of legal substances." However, the State is not required to prove the purity of the substance or otherwise weigh individual components in the mixture.

{¶58} The Supreme Court of Ohio held in *State v. Gonzales*, 2017-Ohio-777, ¶ 3 "that the entire 'compound, mixture, preparation, or substance,' including any fillers that are part of the usable drug, must be considered for the purpose of determining the appropriate penalty for cocaine possession under R.C. 2925.11(C)(4)." Therefore, the entire mixture's weight, including any legal substances used as fillers, must be considered.

{¶59} In the instant case, officers, upon appellant's arrest, searched his person and discovered a bag of suspected drugs. That bag of white powder was tested and confirmed to contain cocaine. Koubek determined that the weight of that cocaine, including all fillers, was 26.41 grams. At trial, appellant admitted that the plastic bag found in his pocket contained cocaine.

{¶60} Upon review of the entire record, we conclude that the jury did not lose its way in convicting appellant of possession of cocaine. The record supports the jury's conclusion, and their decision does not create a miscarriage of justice. As such, appellant's conviction is not against the manifest weight of the evidence.

{¶61} Appellant's third assignment of error is without merit.

15

{¶62} For reasons set forth above, the judgment of the Lake County Court of Common Pleas is hereby affirmed.

MARY JANE TRAPP, J.,

JOHN J. EKLUND, J.,

concur.