**IN THE COURT OF APPEALS OF IOWA**

No. 24-1132
Filed October 29, 2025

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**JAMODD AMAUL SALLIS,**
        Defendant-Appellant.
_____

        Appeal from the Iowa District Court for Black Hawk County, David P. Odekirk, Judge.

        A criminal defendant appeals his conviction of sexual abuse in the third degree, enhanced as a habitual offender.  **AFFIRMED.**

        Christopher Kragnes Sr., Des Moines, for appellant.

        Brenna Bird, Attorney General, and Joshua Henry, Assistant Attorney General, for appellee.

        Considered without oral argument by Tabor, C.J., Greer, J., and Doyle, S.J.* Buller, J., takes no part.

        *Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2025).

**GREER, Judge.**

Jamodd Sallis appeals his conviction of sexual abuse in the third degree, enhanced as a habitual offender. Pointing to a breakdown in the middle of trial between him and trial counsel, Sallis claims the district court erred by denying him the right to counsel by failing to appoint him new counsel or inquire into the details of the breakdown in his attorney-client relationship. But we find the district court dedicated significant time inquiring into the relationship breakdown and Sallis never requested substitute counsel, so we affirm.

## I. Background Facts and Proceedings

In October 2021, the State charged Sallis with sexual abuse in the third degree. The State alleged that Sallis, then forty years old and married, had sex with the fifteen-year-old victim—his "distant cousin"—on at least three different occasions and had impregnated her. The victim testified that she occasionally babysat for the Sallis family, including on trips the family took outside of their hometown of Waterloo. Sallis had sex with the victim in the Sallis family home in Waterloo on two occasions and outside of the home on three other occasions. She testified that Sallis is the father of her child born in 2021, which an Iowa Division of Criminal Investigation criminalist confirmed with 99.9999% certainty. Upon learning that Sallis was the father of the child, the victim's mother reported Sallis to local authorities.

After being charged and arrested, Sallis was provided court-appointed counsel. Over the course of the next eight months, the district court appointed and allowed withdrawal of attorneys representing Sallis on eight separate occasions. Upon his own motion, Sallis was finally permitted to represent himself in June

2022, and standby counsel was appointed. Yet, in September, after Sallis filed a financial affidavit and applied for counsel, an attorney from the Waterloo Public Defender's Office was appointed and appeared on behalf of Sallis. Sallis did not raise any concerns with his newly appointed counsel until day two of the jury trial, which began in January 2024.

On the second day of trial, the State first called the victim as a witness. Following his counsel's cross-examination of the victim, Sallis requested a sidebar outside the presence of the jury. His counsel informed the court,

> I'm not sure the nature of what Mr. Sallis wanted a sidebar for. I assume it's based on my cross-examination of [the victim]. I think we have a[n] extreme difference in opinion on how to approach this case and what questions to ask. I am unwilling to do it the way he wants it done, and so I don't really know what to do from here.

The district court asked what Sallis "would like to say." Sallis maintained that nothing happened in Waterloo that was of a "sexual nature" and that sexual intercourse only happened in Davenport, so his counsel's cross-examination of the victim did not further his theory of defense. He further stated that "there could have been questions asked" by his counsel "to be able to get to that point and to ask [the victim] different questions where [the victim] could be able to really say what actually happened." Counsel responded that she did not support the line of questioning urged by Sallis, which he claimed would "pull [the victim's] lies out." She further reiterated that she did not believe Sallis's line of questioning would impeach the victim because the victim's testimony was consistent with her previous statements and child-protection-center (CPC) interview. As counsel put it: "I know what he wants me to ask. I do not think it is impeachment, and I am not going to ask the questions that he wants me to ask. And that is where we are—I

don't know—am I a puppet." The district court inquired whether Sallis or his counsel wanted to make an offer of proof. At this point, the court confirmed that strategic decisions are counsel's to make, but permitted calling the victim back to the witness stand for an offer of proof by Sallis. But the district court, defense counsel, and the State all expressed confusion over how the offer of proof could impeach the victim since she had always maintained that Sallis had sex with her in Waterloo:

> DEFENSE COUNSEL: I mean, there's no strategy involved in it. I just simply don't think that it's—that the girl made an inconsistent statement about [sex occurring in Waterloo].
> THE COURT: And I guess let's . . . make a record, though, on what the inconsistency is alleged to be.
> DEFENSE COUNSEL: Okay. So Mr. Sallis's position is that [the victim] said to CPC originally that no sex occurred in Waterloo. I have watched the video. He has watched the video too. We have a difference of opinion on what she's saying. I believe she's saying that sex happened in Waterloo and he touched her bottom. He believes that she only said that her bottom was touched. So I don't know if we can submit the CPC video as a court exhibit or something for future reviewing courts. But the point is she told CPC that sex happened in Waterloo. She testified at a deposition that sex happened in Waterloo. I'm not going to impeach her and pretend that she didn't say that that happened when she did. I can't do that.
> THE COURT: And, [assistant county attorney], does the State have any position on all of this? Does it disagree with anything [defense counsel] has said as far as what's in the CPC interview tape?
> COUNTY ATTORNEY: No, the State doesn't believe that [the victim] has made an inconsistent statement when we're talking about the sex acts that occurred in Waterloo. And the State would absolutely object to the defendant being afforded the opportunity to cross-examine the victim in this case.

Both sides then agreed that a copy of the CPC interview and an Iowa Department of Health and Human Services report would be submitted as exhibits for purposes of creating a record on the issue. Following the offer of proof, subsequent testimony of the victim's mother, and a break, defense counsel

explained to the court that the attorney-client relationship had degraded completely:

> At some point during the break Mr. Sallis asked that he speak with me and my [supervisor], in a different room, and so we spent some time there. I was there for about half of the time. Essentially where I see it is that Mr. Sallis and I have a complete difference in opinion on how this case should be run. [My supervisor] explained to him how that works is that I choose this and if he disagrees then I don't—then I'm not his lawyer.
>
> And Mr. Sallis wishes that I would meet with him longer or hear him longer or listen to his questions, and it is my position I have listened to all his questions and I have answered all the questions that matter. I'm not—I have spent countless hours talking to Mr. Sallis. There's nothing else to talk about.
>
> We have had a complete breakdown of communication. Our attorney-client relationship is toast. I don't know what to do. He's completely dissatisfied with all the questions I'm asking. I can't sit here and keep asking questions and keep defending this man as every single thing I do I'm being questioned on.
>
> So I don't know where to go from here. And I know that [my supervisor] basically told him, listen, you either proceed forward with [me] or you ask to fire and ask for a mistrial or something. I don't know what Mr. Sallis's choice is or what he wants to do. But that's where I'm at. I'm done.

In response, Sallis voiced disagreement with the characterizations of counsel. He advised the court that he and defense counsel had "spent time on the telephone where I would start asking questions and honestly never get to be able to get my questions out before getting cut off and not really able to get the question through" and that "there's no getting through" to his counsel. Sallis additionally alleged that defense counsel had not given his case sufficient time:

> Your Honor, she's told me herself that she has not—I had to ask her to look at certain videos that she had not looked at. I had to ask her—because she sent the investigator over so I can watch the videos because she hadn't watched them. I had to tell her what was in those videos so that she can understand the other part of the case. I have evidence that she doesn't have, and I'm trying to show her that and she's not looking at it.
>
> . . . .

So she's told me herself out of her mouth that, oh, I'm on the way and I like to do it last minute, I'm a last-minute type of girl. Those are her lang—that's her language. So there's not been hours spent on my case. I have to disagree with that. And I wanted that to be on the record.

The district court then framed the question to Sallis as "at this time . . ., Mr. Sallis, are you prepared to go forward with [defense counsel] as your attorney or not." The district court observed that there had been plenty of time to prepare, witnesses had been established for "about . . . a couple years practically," and "the question really is straightforward. You certainly have the right to assist in your defense, but [defense counsel] is the attorney[,] and she's the one to determine which questions should be ultimately asked the witness and decide how to proceed with that."

Sallis then asked the court if he had a right to understand his counsel's trial strategy, to which the court clarified, "You have a right to consult with your attorney and understand from her whatever—ask whatever questions you want to of her." Defense counsel responded that "it's going to change nothing. We can go into another room and talk again. We are not going to communicate with each other. We'll come back in ten minutes and have the same thing."

The district court then decided,

So here's what we're going to do. I'm going to—and I understand, [defense counsel], your position. I do. I'm hearing you. And I'm hearing you, Mr. Sallis. But I'm going to give us twenty-five minutes to talk about what questions may be asked with regard to the next two witnesses we're going to have before lunch. We'll come back at 11:30 and finish those two witnesses up before lunch hopefully. Does that sound realistic?

Trial then proceeded without further issues relating to defense counsel's representation of Sallis. The jury convicted Sallis as charged. Following trial,

defense counsel moved to withdraw, citing Iowa Rule of Professional Conduct 32:1.16(b)(4), which states "a lawyer may withdraw from representing a client if . . . the client insists upon taking action that the lawyer considers repugnant or with which the lawyer has a fundamental disagreement," and Iowa Rule of Professional Conduct 32:1.16(a)(2), which states that an attorney "shall withdraw from the representation of a client if . . . the lawyer's physical or mental condition materially impairs the lawyer's ability to represent the client."  That motion was granted, new counsel was appointed, and deadline for post-trial motions was extended.

Sallis now appeals, arguing the district court erred by denying him the right to counsel by failing to appoint him new counsel or thoroughly inquire into the breakdown in his attorney-client relationship.

## II.     Error Preservation

The State contests error preservation, arguing that *State v. Tejeda* requires the defendant to explicitly request substitute counsel before any sua sponte duty of inquiry into a communication breakdown is placed on the district court.  677 N.W.2d 744 (Iowa 2004).  The State emphasizes the *Tejeda* court's holding that, "we therefore now explicitly recognize that there is a duty of inquiry *once a defendant requests substitute counsel* on account of an alleged breakdown in communication."  *See id.* at 750 (emphasis added).  At first blush, the *Tejeda* court's holding may appear to have imposed a hard-and-fast requirement for the defendant to request substitute counsel.  But the supreme court further clarified that the question is whether the trial court was "apprised of a potential breakdown in communication" that constituted "a complete breakdown in communication between the attorney and the defendant."  *Id.* at 750–51 (citation omitted).

Although Sallis never directly requested substitute counsel, both he and defense counsel extensively described the alleged breakdown in communication and provided the district court with "a colorable complaint" alerting the district court of the need for an inquiry. *Id.* at 751. Error is preserved.

### III.     Standard of Review

We review the district court's decision not to appoint substitute counsel for an abuse of discretion. *Id.* at 749; accord *State v. Martin*, 608 N.W.2d 445, 449 (Iowa 2000). By contrast, a claim that the district court failed to inquire into a communication breakdown presents a constitutional question, which we would typically review de novo. *See Tejeda*, 677 N.W.2d at 749. Here, the district court did inquire into Sallis's concerns, and so we proceed to review the court's course of action for an abuse of discretion.

### IV.     Discussion

Sallis claims the district court erred in not appointing substitute counsel and not thoroughly inquiring into the attorney-client relationship breakdown. Sallis highlights his defense counsel's statements that there had been "a complete breakdown of communication," the "attorney-client privilege is toast," "I am done," and she could not "keep defending [Sallis] as every single thing I do I'm being questioned on."

"In all criminal prosecutions, the accused shall enjoy the right to . . . have the Assistance of Counsel for his defence." U.S. Const. amend. VI. And the Iowa Constitution also enshrines the right to counsel, stating: "In all criminal prosecutions . . . the accused shall have a right to . . . have the assistance of counsel." Iowa Const. art. I, § 10. But these rights do not guarantee a "meaningful

relationship" between client and counsel. *Morris v. Slappy*, 461 U.S. 1, 14 (1983). A defendant requesting substitute court-appointed counsel bears the burden to show "a conflict of interest, irreconcilable conflict, or a complete breakdown in communication between the attorney and the defendant." *State v. Lopez*, 633 N.W.2d 774, 779 (Iowa 2001) (citation omitted). And "[l]ast-minute requests for substitute counsel, insofar as they constitute a delay tactic, are disfavored." *Tejeda*, 677 N.W.2d 750.

An adequate inquiry into a communication breakdown or conflict can include when the presiding judge "personally ask[s] the defendant at a hearing to explain the nature of the communication problem." *Id.* at 751. The judge should seek to determine if the defendant's claims are related to defense counsel's representation. *See id.* "[T]o prove a total breakdown in communication, a defendant must put forth evidence of a severe and pervasive conflict with his attorney or evidence that he had such minimal contact with the attorney that meaningful communication was not possible." *Id.* at 752 (quoting *United States v. Lott*, 310 F.3d 1231, 1249 (10th Cir. 2002)).

The district court dedicated significant time to inquiry into the difference in opinions Sallis and his counsel held relating to questioning the victim. And the court agreed with Sallis's counsel that the dispute was over a strategic question, stating "these differences [are] strategic in nature and ones that counsel is typically afforded the latitude to make decisions on how to cross-examine and impeach witnesses." The district court was similarly unpersuaded by Sallis's allegation that defense counsel had not reviewed all the evidence and had not dedicated sufficient time to his case, explaining that "[t]here's undoubtedly been hours and hours and

hours and hours of time spent" on his case. Nonetheless, the court still asked if Sallis would like substitute counsel. Sallis did not request substitute counsel.

While Sallis's complaints in relation to his defense counsel were sufficient to preserve his claim on appeal, his failure to directly request substitute counsel is informative to the court's exercise of discretion. Indeed, the district court directly asked Sallis, "are you prepared to go forward with [defense counsel] as your attorney or not[?]" Sallis did not respond by requesting new counsel, only requesting clarification on whether he has "a right as a client to understand what the strategy is between myself and . . . my attorney?" And after being given a break to further consult with his attorney, Sallis never requested substitute counsel. The court extensively entertained Sallis's complaints about his defense counsel, and after hearing those complaints, requested definitive clarification from Sallis on whether he was requesting new counsel.

Based upon the court's careful exploration of Sallis's concerns regarding his counsel and the record before us, we find the district court exercised appropriate discretion in not granting relief Sallis did not request from it. We affirm.

**AFFIRMED.**